**PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. 2254**

Petitioner's name:              **Terance Valentine**
Prisoner's number:            **DOC No. 119682**
Place of Confinement:        **Union Correctional Institution, Raiford, Florida**


**TERANCE VALENTINE,**
      **Petitioner,**

**v.**                                              **CASE NO.    8:13-cv-30-T-23TBM**
**SECRETARY, FLORIDA**
      **DEPARTMENT OF CORRECTIONS,**
      **Respondent.**

_____/


-------------------------------------------------------------

**PETITIONER'S MEMORANDUM OF LAW
IN SUPPORT OF PETITION FOR
WRIT OF HABEAS CORPUS**


-------------------------------------------------------------


**ALI SHAKOOR.
ASSISTANT CCRC-MIDDLE
FLORIDA BAR NO.: 669830
OFFICE OF THE CAPITAL
COLLATERAL REGIONAL COUNSEL
3801 CORPOREX PARK DRIVE
SUITE 210
TAMPA, FL 33609-1004
(813) 740-3544**

# TABLE OF CONTENTS

Table of Contents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Table of Citations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Memorandum. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.      The Preconditions for Applying Section 2254 (d) (1).. . . . . . . . . . . . . . . . . . . . . . . . . 1

B.      The Application of Section 2254 (d) (1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      1.      "Clearly established law as determined by the Supreme Court of the United States.". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      2.      The "contrary to" clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      3.      The "unreasonable application" clause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

GROUND I

The trial judge erred by ruling that the Husband-Wife privilege of section 90.504, Florida Evidence Code, was inapplicable with respect to the counts where Ferdinand Porche was the victim.. . . . . 5

GROUND II

The trial judge should have granted Valentine's motion to suppress statements made subsequent to his illegal arrest during interrogation by Detective Fernandez. . . . . . . . . . . . . . . . . . . . . . . . . . . 8

GROUND III

The trial judge erred by denying Petitioner's motion to strike the footprint exhibits because the expert's opinion was so speculative that it could not reasonably link the prints to Petitioner.. . . 11

GROUND IV

The trial court's refusal to appoint an expert in jury selection was a denial of due process and equal protection of law under the extraordinary circumstances of this case.. . . . . . . . . . . . . . . . . . . . 12

GROUND V

The trial judge erred by denying Appellant"s motion to grant defendant the concluding argument to the jury because his presentation of alibi witnesses caused him to lose this valuable procedural right in violation of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments.. . . 15

GROUND VI

The trial court erred by giving the standard reasonable doubt instruction rather than the one proposed by Petitioner because the language of the standard instruction allows the jury to convict a criminal defendant where a reasonable doubt exists, contrary to the due process clause of the Fourteenth Amendment... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

GROUND VII

Petitioner's conviction for attempted murder in the first degree should be vacated because it may rest on a theory of attempted felony murder - a nonexistent offense.. . . . . . . . . . . . . . . . . . . . . . 19

GROUND VIII

The sentencing judge erred by finding that the cold, calculated and premeditated aggravating circumstance was proved.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

GROUND IX

The sentencing judge rejected the statutory mitigating circumstance based upon evidence that Petitioner was incarcerated for two years in Costa Rica, his federal prison sentence for an immigration violation, and several arrests reported in the presentence investigation. Of these, only the federal sentence for an immigration violation should have been considered and it did not amount to significant criminal activity.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

GROUND X

Petitioner was denied the effective assistance of counsel at the guilt and sentencing phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United states and the corresponding provisions of the Florida Constitution. Trial counsel failed to object to blatant prosecutorial conduct on the part of State Attorney Karen Cox due to her repeatedly using the name Livia Porche or otherwise implying that Mr. and Mrs. Valentine were no longer married. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

GROUND XI

The lower court erred in summarily denying Petitioner a hearing on all of Claim XI (6), which alleged that trial counsel was ineffective for failing to object to multiple examples of prosecutorial misconduct during closing argument, in violation of the Sixth, Eighth, and fourteenth Amendments to the Constitution of the United States and the corresponding provisions of the Florida Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

GROUND XII

The lower court erred in holding that Petitioner was not denied the effective assistance of counsel at the sentencing phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the corresponding provisions of the Florida Constitution.  Trial counsel failed to adequately challenge the State's case, counsel's performance was deficient, and as a result the death sentence is unreliable. . . . . . . . . . . . . . . . . . . . . . . . . . . 36

GROUND XIII

Appellate counsel was ineffective on direct appeal for not raising the claim that Petitioner was denied a fundamentally fair trial guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United states Constitution and the corresponding provisions of the Florida constitution due to the State's improper comments during closing argument.. . . . . . . . . . . . . . 56

GROUND XIV

Cumulatively, the combination of procedural and substantive errors deprived Petitioner of a fundamentally fair trial guaranteed under the Fourth, Fifth, Sixth, Eighth, and Fourteenth amendments to the United States Constitution and the corresponding provisions of the Florida Constitution... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

GROUND XV

Petitioner" Eighth Amendment right against cruel and unusual punishment will be violated as Petitioner may be incompetent at time of execution.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Certificate of Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

## TABLE OF CITATIONS

Ake v. Oklahoma,
    470 U.S. 68 (1985)... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
Ake v. Oklahoma,
    470 U.S. 68, 80-1, 105 S.Ct. 1087, 1095 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
Allen v Butterworth,
    756 So.2d 52 (Fla. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
Allen v Butterworth,
    756 So.2d 52, 66-67 (Fla. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
Bachellar v. Maryland,
    397 U.S. 564 (1970).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
Baxter v. Thomas,
    45 F.3d 1501, 1514 (11th Cir. 1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
Blau v. United States,
    71 S.Ct. 301, 95 L.Ed. 306 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Brooks v. Tennessee,
    406 U.S. 605 (1972).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Brown v. Illinois,
    422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975). . . . . . . . . . . . . . 8
Brown v. Illinois,
    422 U.S. 590 (1975).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
Brown v. State,
    593 So.2d 1210 (Fla.2d DCA 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35,64
Bruno v. State,
    807 So.2d 55, 74 (Fla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
Cage v. Louisiana,
    498 U.S. 39 (1990).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
Caraballo v. State,
    762 So.2d 542 (Fla. 5th DCA 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,64
Caraballo v. State,
    762 So.2d 542 (Fla. 5th DCA 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
Daubert v. Merrell Dow Pharmaceuticals, Inc.,
    509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993).. . . . . . . . . . . . . . . . . . . . . . . 12
Davis v. State,
    648 So.2d 1249 (Fla. 4th DCA 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
Deaton v. Dugger,
    635 So.2d 4, 8 (Fla. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
Derden v. McNeel,
    38 F.2d 605 (5th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65
Douglas v. State,
    575 So.2d 165 (Fla. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

v

Dunaway v. New York,
    442 U.S. 200 (1979).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Eddings v. Oklahoma,*
    455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). . . . . . . . . . . . . . . . . . . . 55

Farinas v. State,
    569 So.2d 425 (Fla. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Ford v. Wainwright,
    477 U.S. 399, 106 S.Ct. 2595 (1986).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Garcia v. State,
    622 So.2d 1325, 1332 (Fla. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,63

Garron v. State,
    528 So.2d 353, 359 (Fla. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,63

Gore v. State,
    719 So.2d 1197, 1203 (Fla.1998).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,61

Griffin v. California,
    380 U.S. 609 at 614 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Griffin v. United States,*
    502 U.S. 46, 112 S.Ct. 466, 166 L.Ed 2d 371 (1991). . . . . . . . . . . . . . . . . . . . . 19

Griffin v. United States,
    502 U.S. 46 (1991).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Heath v. Jones,
    941 F.2d 1126 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Herrera v. Collins,
    506 U.S. 390, 113 S. Ct. 853, 122 L.Ed.2d 203 (1993).. . . . . . . . . . . . . . . . . . . 67

*Hitchcock v. State,*
    991 So.2d 337, 361 (Fla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Hildwin v. Dugger,
    654 So.2d 107 (Fla. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Hildwin v. Dugger,
    654 So.2d 107 (Fla. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Holsworth v. State*
    522 So.2d 348, 354 (Fla. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Hoskins v. State,*
    965 So.2d 1, 17-18 (Fla. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Hurst v. State
    18 So.2d 975 (Fla. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Jones v. State,
    998 So.2d 573 (Fla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Kellogg v. State,
    761 So.2d 409 (Fla. 2d DCA 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,61

Koon v Dugger,
    619 So.2d 246, 249 (Fla. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Landry v. State,
    620 So. 2d 1099 (Fla. 4th DCA 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Leary v. United States,
    395 6 at 31-2 91969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Lockett v. Ohio,
    438 U.S. 586 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Lockhart v. Fretwell,
    506 U.S. 364 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Martin v. Wainwright,
    497 So.2d 872 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Massaro v. U.S.,
    538 U.S. 500 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Massaro v. U.S.,
    538 U.S. 500, 504 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

McDonald v. State,
    743 So.2d 501 (Fla. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,64

Mungin v. State,
    932 So.2d 986, 997 (Fla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Nowitzke v. State,
    572 So.2d 1346, 1356 (Fla. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,63

Orme v. State,
    896 So.2d 725, 732 (Fla. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Patton v. State,
    878 So.2d 368, 379 (Fla. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Pearce v. State,
    994 So.2d 1094 (Fla. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Penalver v. State,
    926 So.2d 1118 (Fla. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Poland v. Stewart,
    41 F. Supp. 2d 1037 (D. Ariz 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Porter v. McCollum,
    558 U.S. 30, 130 S.Ct. 447, 449 (2009) 175 L.Ed.2d 398 (2009). . . . . . . . . . . . . . . . . . 53

Ragsdale v. State,
    798 So.2d 713 (Fla. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Ray v. State,
    403 So. 2d 956 (Fla. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Ryan v. State,
    457 So.2d 1084, 1091 (Fla. 4th DCA 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Richardson v. State,
    604 So.2d 1107 (Fla. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Rideau v. Louisiana,
    373 U.S. 723 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Riley v. State,
   560 So.2d 279, 280 (Fla. 3d DCA 1990)...................................31,61
Rock v. Arkansas,
   483 U.S. 44 at 56 (1987). ...............................................16
Rompilla v. Beard,
   125 S.Ct. 2456, 2466 (U.S., 2005). ......................................39
Rosso v. State,
   505 So.2d 611, 612 (Fla. 3d DCA 1987)...................................31,61
Ruiz v. State,
   743 So.2d 1 (Fla. 1999). .............................................28,32,61
Ryan v. State,
   457 So.2d 1084, 1091 (Fla. 4th DCA 1984)..................................32
Santos v. State,
   591 So.2d 160 (Fla. 1991). ..............................................21
Schoenwetter v. State,
   46 So.3d 535, 546 (Fla. 2010). ..........................................30
Silva v. Nightingale,
   619 So.2d 4, 5 (Fla. 5th DCA 1993).....................................34,64
Sochor v. Florida,
   112 S.Ct. 2114, 119 L.Ed.2d 326 (1992)...................................21
Slack v. McDaniel,
   120 S.Ct. 1595, 1603 (2000). .............................................6
Solesbee v. Balkcom,
   339 U.S. 9, 12, 70 S.Ct. 457, 458, 94 L. Ed. 604 (1950).....................36
Spann v. State,
   985 So.2d 1059, 1068 (Fla. 2008). .......................................30
Spencer v. State,
   842 So.2d 52, 60 (Fla. 2003). ...........................................56
State v. Gray,
   654 So.2d 552 (Fla. 1995). ..............................................19
State v. DiGuilio,
   491 So.2d 1129 (Fla. 1986). .............................................19
State v. DiGuilio,
   491 So. 2d 1129 (Fla. 1986)...............................................65
State v. Lewis,
   838 So.2d 1102, 1113 (Fla. 2002). .......................................48
Stewart v. Martinez-Villareal,
   118 S.Ct. 1618 (1998). ..................................................67
Stevens v. State,
   552 So.2d 1082, 1086 (Fla. 1989). .......................................43
Strickland v. Washington,
   466 U.S. 668 (1984)......................................................2,3

viii

Strickland v. Washington,
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Strickland v. Washington,*
    466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Stewart v. State,
    622 So. 2d 51 (Fla. 5th DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Stromberg v. California,
    283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Sullivan v. Louisiana,
    508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed 2d 182 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 18

Taylor v. Alabama,
    457 U.S. 687 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Taylor v. Illinois,
    484 U.S. 400 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Taylor v. State,
    640 So. 2d 1127 (Fla. 1st DCA 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

The Florida Bar v. Karen Schmid Cox,
    794 So.2d 1278, 1287 (Fla. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Torres-Arboleda v. Dugger,
    636 So.2d 1321 (Fla. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Valentine v. State,
    98 So.3d 44 (2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25,66

Valentine v. State,
    688 So.2d 313 (Fla. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Van Tran v. Lindsey,
    212 F.3d 1143 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Vento v. State,
    621 So.2d  493 (Fla. 4th DCA 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Victor v. Nebraska,
    127 L.Ed 2d 583 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

United States v. Morris,
    568 F.2d 396, 401 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,62

United States v. Steele,
    147 F.3d 1316, 1317-18 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

United States v. Sterba,
    22 F.Supp.2d 1333 (M.D. Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

United States v. Young,
    105 S. Ct. 1038 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

United States v. Young,
    105 S. Ct. 1038 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Urbin V. State,
    714 So.2d 411 (Fla. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34,63

Valentine v. State,
    98 So.3d 44(2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
Washington v. Texas,
    388 U.S. 14 at 19 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
White v. State,
    616 So.2d 21 (Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Wiggins v. Smith,
    123 S.Ct. 2527 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
Wiggins v. Smith,
    539 U.S. 510, 523 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
Williams v. Taylor,
    120 S.Ct. 1495 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
Williams v. Taylor,
    529 U.S. 362 (U.S. Va., 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
*Williams v. Taylor,*
    529 U.S. 392, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). . . . . . . . . . . . . . . . . . . 54
Wolfle v. United States,
    291U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Wong Sun v. United States,
    371 U.S. 471 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
Yates v. United States,
    354 U.S. 298 at 311 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
**Other Authorities:**
28 U.S.C. § 2254 (d) (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
section 2254 (d) (1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1,2,3,5
section 2254 (d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
section 2254 (d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
§ 90.504, Fla. Stat. (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§ 90.50 (3) (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Fla. Stat. (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
§27.54 (3), Fla. Stat. (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Fla. R. Crim. P. 3.250. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
Rule 3.250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
Fla. R. Crim. P. 3.250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Fla. R. Crim. P. 3.250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Fla. R. Crim. P. 3.250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
386 U.S., at 24, 87 S.Ct., at 828. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Rule 4-3.4(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Rule 4-3.5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
Fla. Stat.§ 921.141 (6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
Florida Rules of Criminal Procedure 3.811 and 3.812. . . . . . . . . . . . . . . . . . . . . . . 66
Section 922.07, Florida Statutes (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66
section 922.07, Florida Statutes (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

MEMORANDUM

Mr. Valentine's habeas petition was filed after the effective date of the Anti-Terrorism and

Effective Death Penalty Act ("AEDPA"). Under AEDPA's section 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of that claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254 (d) (2003).

## A.    The Preconditions for Applying Section 2254 (d) (1).

The standard of review for federal habeas claims to which section 2254 (d) (1) applies is

described in Williams v. Taylor, 120 S.Ct. 1495 (2000). Some claims, however, are not subject to

section 2254 (d) (1) at all.  By its plain language, section 2254 (d) applies to a claim only when the

claim "was adjudicated on the merits" by the state court, and only where that adjudication resulted

in a "decision" on the claim. In order for those requirements to be satisfied, the state court must issue

a "decision" that (1) addresses the petitioner's actual federal claim "on the merits" (as opposed to

on procedural or other grounds); (2) addresses and "adjudicate[s]" the federal claim "on the merits"

(as opposed to on procedural or other grounds); and (3) explains its legal and/or factual reasons for

denying relief, taking into account controlling Supreme Court precedent.

## B.    The Application of Section 2254 (d) (1).

1

For claims to which section 2254 (d) does apply, <u>Williams</u> provides the standard of review for section 2254 (d) (1).

1.      **"Clearly established law as determined by the Supreme Court of the United States."**

For claims to which section 2254 (d) (1) applies, the "threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was <u>clearly established</u>" at "the time of the relevant state-court decision."   <u>Williams</u>, 120 S.Ct. At 1511, 1523.  The claim raised in <u>Williams</u> was that trial counsel had been ineffective, in violation of the Sixth Amendment right to effective assistance of counsel.  For such claims, the Court explained, "[i]t is past question that the rule set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'" <u>Williams</u>, 120 S.Ct. at 1512.  Thus, <u>Strickland</u> provides "clearly established law" governing all of Mr. Valentine's ineffective assistance of counsel claims.

Moreover, the Supreme Court indicated that <u>Strickland</u> is just one example of the type of broadly applicable rules of law that can provide "clearly established" law to which the habeas courts look under AEDPA. As the Court explained:

> That the Strickland test "of necessity requires a case-by-case examination of the evidence" obviates neither the clarity of the rule nor the extent to which the rule must be seen as "established" by this Court.

<u>Williams</u>, 120 S.Ct. At 1512 (quoting Wright v. West, 505 U.S. 277, 308 (1992) (Kennedy, J., concurring)). Similarly, other "framework" Supreme Court cases - *i.e.*, Supreme Court cases that "are 'general' in the sense that they erect a framework specifically intended for application to variant factual situations" also merit classification as "clearly established" law.

2.      **The "contrary to" clause**.

2

Once the relevant "clearly established" law has been identified, the Supreme Court explained that the statutory language of both the "contrary to" clause and the "unreasonable application" clause of section 2254 (d) (1) must be given effect. Thus, a federal habeas court should grant the Writ:

> if one of the following two conditions is satisfied - the state-court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

Williams, 120 S.Ct. at 1523.

In Williams, the Supreme Court noted two ways in which a state court decision could be "contrary to ... clearly established federal law." The first is if the state court does not correctly identify and articulate the legal principles that govern the claim. This happens when the state court's decision is "substantially different from the relevant precedent of this Court," when the state court "applies a rule that contradicts the governing law set forth in our cases" or when the state court applies law that is "diametrically different," "opposite in character or nature," or "mutually opposed" to established Supreme Court precedent. Id. at 1519.

In order to make this determination, the federal court must conduct an independent review of the relevant Supreme Court precedent, as Williams makes clear.  In Williams itself, the Virginia Supreme Court had added to the prejudice prong of the Strickland v. Washington, 466 U.S. 668 (1984) test for ineffective assistance of counsel claims an additional requirement that the petitioner show that his conviction or sentence was fundamentally unfair, citing Lockhart v. Fretwell, 506 U.S. 364 (1993). See Williams, 120 S.Ct. at 1512-13 (discussing the Virginia Supreme Court's opinion). Many federal Courts of Appeal and state courts had made similar rulings.

3

But in <u>Williams</u>, the Supreme Court held that adding the <u>Lockhart</u> requirement to ineffective assistance claims was "contrary to" <u>Strickland</u>. <u>Williams</u>, 120 S. Ct. At 1512-14, 1515. Thus, if state court misinterprets relevant Supreme Court precedent, the resulting "decision" is "contrary to ... clearly established federal law, as determined by the Supreme Court."

The second way in which a state court decision may be "contrary to ... clearly established federal law" is "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." <u>Id</u>. at 1519-20. This does not require that the facts of the two cases be identical, but only that they be "materially indistinguishable."

In summary, <u>Williams</u> held:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.

<u>Id</u>. at 1523.

## 3.     The "unreasonable application" clause.

Relief should be granted under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 120 S.Ct. At 1523. "[A] federal court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." <u>Id</u>. at 1521.

In <u>Williams</u>, 120 S.Ct. at 1515, the Supreme Court found that the Virginia Supreme Court's decision was an "unreasonable application of" <u>Strickland</u>, in addition to being "contrary to"

4

Strickland. The state court's decision was unreasonable, both because it improperly added the Lockhart requirement to the petitioner's ineffective assistance claim, but also because in determining prejudice it failed to consider all of the available mitigating evidence in the petitioner's favor (even though it correctly emphasized the strength of the petitioner's case). Id. at 1515-16. Thus, the Virginia Supreme Court's decision was an "unreasonable application of Strickland because it failed to consider all of the facts that were relevant to the Strickland analysis, even though it correctly considered most of them.

In sum, Williams makes clear that under section 2254 (d) (1), federal court review of habeas claims must remain careful, robust and thorough, consistent with the historic and continuing importance of the writ of habeas corpus. "The writ of habeas corpus plays a vital role in protecting constitutional rights," Slack v. McDaniel, 120 S.Ct. 1595, 1603 (2000), and in interpreting AEDPA the Supreme Court has recognized that fact and adopted "the interpretation of AEDPA that espoused the more robust habeas review." Van Tran v. Lindsey, 212 F.3d 1143 (9th Cir. 2000).

### GROUND I

**The trial judge erred by ruling that the Husband-Wife privilege of section 90.504, Florida Evidence Code, was inapplicable with respect to the counts where Ferdinand Porche was the victim**

The Florida Supreme Court denied this claim, holding:

> Valentine first claims that he and Romero were never legally divorced and that the husband-wife evidentiary privilege thus barred portions of Romero's testimony. We disagree. The privilege provides:

> (1) A spouse has a privilege during and after the marital relationship to refuse to disclose, and to prevent another from disclosing, communications which were intended to be made in confidence between the spouses while they were husband and wife.

5

§ 90.504, Fla. Stat. (1993). An exception to the privilege permits testimony in certain cases of inter-spousal crime:

(3) There is no privilege under this section:

...

(b) In a criminal proceeding in which one spouse is charged with a crime committed at any time against the person or property of the other spouse ....

§ 90.50 (3) (b), Fla. Stat. (1993). Valentine contends that although Romero's testimony concerning the attempted murder of her is embraced within the above exception to the privilege, her testimony concerning Porche's murder is not and thus is shielded by the privilege.

We find this claim to be without merit. The plain language of the above exception encompasses precisely the situation claimed by Valentine to exist in the present case: This is a proceeding (a criminal trial) in which one alleged spouse (Valentine) is charged with committing a crime (attempted first-degree murder) against the person of the other spouse (Romero). This reading of the exception comports with the basic policy underlying the privilege, which is to promote marital harmony. The construction urged by Valentine, on the other hand, would make a mockery of that policy, for how — or why — would the state possibly seek to promote marital harmony between a killer and his would - be victim? 7 We find no error.

Valentine's contention that Romero's testimony is protected because it falls within an exception that was deliberately eliminated by the legislature in 1978 is specious. The earlier exception provided:
(3) There is no privilege under this section:
....
(b) In a criminal proceeding in which one spouse is charged with:
2. A crime committed at any time against the person or property of a third person, which crime was committed in the course of committing a crime against the person or property of the other spouse.
§ 90.504, Fla. Stat. (1977). The policy underlying the privilege dictates that this exception was applicable in this cases where one spouse committed a crime against both a third person and the other spouse but was charged in the pending proceeding with the crime against the third person. That is not the case in the present proceeding.

6

Valentine v. State, 688 So.2d 313 (Fla. 1996). (footnote omitted). This decision was contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Supreme Court in Wolfle v. United States, 291 U.S. 7, 54 S.Ct. 279, 78 L.Ed. 617 (1934) clearly recognized the husband wife privilege and that marital communications are presumptively confidential. In Blau v. United States, 71 S.Ct. 301, 95 L.Ed. 306 (1951) the Court held that the defendant was entitled to his privilege against disclosing marital communications where the defendant refused to reveal the whereabouts of his wife even where he obtained his knowledge through communications with her.

Livia Romero had never been divorced from Mr. Valentine, she was his legal wife both at the time of the shootings and at trial. At trial, Mr. Valentine first attempted to exclude marital communications from Livia Romero's testimony when he objected to the prosecutor's questions concerning abuse during the marriage. At the bench conference, defense counsel agreed that the husband/wife privilege does not apply when one spouse is charged with a crime against the other. However, counsel maintained that it was fully applicable as to the counts where the third person, Ferdinand Porche, was the victim. The trial court ruled that the husband/wife privilege "does not apply in a criminal proceeding in which the spouse is a victim". The issue next cropped up when the prosecutor asked Livia Romero what Mr. Valentine said when he found out about her purported marriage to Porche. Again Mr. Valentine's objection on spousal privilege grounds was overruled. Mr. Valentine's objection to allowing into evidence his letters written to Romero while both were imprisoned was also overruled. Before the jury heard the second of the taped conversations between

7

Petitioner and Romero, defense counsel clarified the facts surrounding th marital privilege objection.

Ultimately, the trial court specifically ruled that the spousal privilege did not exist for "all crimes

arising from the transaction which, in this case, is all counts of the indictment."

The United States Supreme Count pronouncements on the marital privilege dictate that the

communications between Mr. Valentine and Livia Romero were privileged. The privilege was fully

applicable as to the counts where the third person, Ferdinand Porche, was the victim.

## GROUND II

**The trial judge should have granted Valentine's motion to suppress statements made subsequent to his illegal arrest during interrogation by Detective Fernandez.**

The Florida Supreme Court denied this claim, holding:

> Valentine next points out that when he was apprehended by the FBI near New Orleans, officers were acting on a warrant later determined to be flawed, resulting in his illegal arrest. He claims that his statement to Detective Fernandez of the Hillsborough County Sheriff's Office was tainted by his unlawful arrest. We disagree. The United States Supreme Court has addressed this issue:

> The question whether a confession is the product of free will .... must be answered on the facts of each case. No single fact is dispositive. The workings of the human mind are too complex, and the possibilities of misconduct too diverse, to permit protection of the Fourth Amendment to turn on such a talismanic test. The *Miranda* warnings are an important factor, to be sure, in determining whether the confession is obtained by explotation of an illegal arrest. But they are not the only factor to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct are all relevant.

> Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975)(footnotes and citation ommitted).

> In the present case, the record supports the trial court's finding that Valentine's statement was sufficiently attenuated from the illegal arrest to purge it of any possible taint. The statement was made nearly two days after the arrest; Valentine had been advised of his rights repeatedly; he had been taken before two federal magistrates; and the nature of the illegality itself was inadvertent and nonflagrant, which Valentine concedes. 8 We find no error.
>
> 8 The arresting officers relied on a federal warrant that was later determined by the trial court to be supported by inadequate evidence.

Valentine v. State, 688 So.2d 313 (Fla. 1996).

In Brown v. Illinois, 422 U.S. 590 (1975), the Court held that when a defendant makes a statement following an illegal arrest, it must be suppressed unless the State can show the statement was an act of free will unaffected by the illegal arrest. The Brown court said that each case must be examined on its own facts:

> The Miranda warnings are an important factor, to be sure, in determining whether the confession is obtained by exploitation of an illegal arrest. But they are not the only factors to be considered. The temporal proximity of the arrest and the confession, the presence of intervening circumstances [citation omitted], and, particularly, the purpose and flagrancy of the official misconduct are relevant.

422 U.S. at 603-4.

In Mr. Valentine's case, the trial court analyzed these factors in ruling that his statement to Detective Fernandez was admissible. The court observed that Valentine had been in custody for almost two days and had been advised three times of his Miranda rights. The judge further noted that Valentine had been before two different judges during this time, although it was unclear whether he had been represented by counsel. The official misconduct was termed "minimal," because the arresting agent relied upon an arrest warrant which was later found invalid.

9

The trial court's reliance on the fact that Mr. Valentine had been in custody for almost two days was misplaced. As Justice Stevens observed in his concurring opinion in <u>Dunaway v. New York</u>, 442 U.S. 200 (1979), "a prolonged detention may well be a more serious explotation of an illegal arrest than a short one." 442 U.S. 220.

The length of Mr. Valentine's detention before being questioned by Detective Fernandez should not be viewed as a factor in favor of admitting his statement.

Another fact cited by the trial judge, being read Miranda warnings on three occasions, does not necessarily weigh in favor of admissibility. In <u>Taylor v. Alabama</u>, 457 U.S. 687 (1982), the Court noted that the defendant was given <u>Miranda</u> warnings three times before his confession. Nevertheless, the <u>Taylor</u> Court found the circumstances were not distinguished from <u>Brown</u>. What this Court should recognize is that when a defendant is continuously in custody and undergoing considerable interrogation, the taint of the illegal arrest is being exploited regardless of <u>Miranda</u> warnings. An important fact is that Mr. Valentine did not initiate the contact with Detective Fernandez. This in itself should weigh heavily against admission of his statement. <u>Compare</u>, <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963) (voluntary return to police station several days after release from custody made ensuing confession an act of free will, untainted by prior illegal arrest).

Regarding whether there were intervening circumstances which dissipated the taint of the illegal arrest, the trial judge found that Valentine's appearance before two federal magistrates on successive days was an intervening circumstance. However, the court acknowledged that the record was unclear as to whether counsel had been appointed for these hearings and whether any subject other than extradition had been discussed.

The burden of proving admissibility of a statement which follows an illegal arrest falls

10

squarely on the prosecution. <u>Brown</u>, 422 U.S. at 604. The prosecution did not carry this burden.

### GROUND III

**The trial judge erred by denying Petitioner's motion to strike the footprint exhibits because the expert's opinion was so speculative that it could not reasonably link the prints to Petitioner.**

The Florida Supreme Court denied this claim, holding:

> Evidence was introduced showing that footprints made by an athletic-type shoe were found on the ground outside Romero's home, on the sliding glass door that had been kicked in, and on the ground in the open field a few feet from the abandoned Blazer. Valentine claims that this evidence should not have been admitted because it was insufficiently linked to him. We disagree. Romero testified that Valentine was wearing tennis shoes at the time of the crime. She gave a description of the perpetrator, including his shoes, to the officer at the scene. Further, the footprints show the perpetrator's path of access into the house and presence in the immediate area of the killing, thus substantiating Romero's version of events. We find no error.

<u>Valentine v. State</u>, 688 So.2d 313 (Fla. 1996).

The State made footprint evidence a feature of their case.  First, a deputy identified a photograph as depicting a footprint found on the outside of the sliding glass door that was kicked in at the residence of Ferdinand Porche and Livia Romero.  The deputy testified that he saw similar footprints in the garage and on the ground outside the garage.  Next, Sharon Sullivan, a crime scene detective, testified that she took photographs at the residence and at the field off Joe Ebert Road on the afternoon of the shootings.  F.D.L.E. employee, Ed Guenther was qualified as an expert in shoe print comparison over defense objection.   Guenther was permitted to testify that he measured the shoe impression on the sliding glass door and the casts of shoe impressions  All three fell within the range of size 10 to 13.   On cross-examination, the witness said he didn't know how many people in the world wore shoes that were between size 10 and size 13.   At the close of the State's case,

11

defense counsel moved to strike the shoeprint exhibits because no connection was shown between Valentine and the exhibits.   There wasn't even any evidence of Petitioner's shoe size, or that it fell within the range of 10 to 13.  The trial court denied the motion to strike.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed. 2d 469 (1993) the United States Supreme Court made clear that to be admissible, expert scientific testimony that is derived from research done for the purpose of litigation must show that the conclusions were reached after following recognized scientific methods of research. Expert opinion must not be based on speculation, but on reliable scientific principles. The fact that a witness is qualified to give an expert opinion does not mean that opinion evidence should necessarily be admitted.

The shoe print evidence was not even relevant because there was no showing that Mr. Valentine was even wearing a shoe that had a lug type pattern, let alone one of the same size as the impressions. Additionally, the shoe print expert's opinion was not helpful to the jury because there are probably millions of athletic shoes in the world within the range of size 10 to 13, a large number of them lug design. It was not shown that Mr. Valentine possessed a pair of shoes with these characteristics.

**GROUND IV**

**The trial court's refusal to appoint an expert in jury selection was a denial of due process and equal protection of law under the extraordinary circumstances of this case.**

The Florida Supreme Court denied this claim as not preserved. Valentine v. State, 688 So.2d 313 (Fla. 1996).

In Ake v. Oklahoma, 470 U.S. 68 (1985), the Court held that an indigent defendant in a

capital case is entitled to appointment of a competent psychiatrist when the defendant's mental condition is a significant factor at trial. The Ake decision, which rests on the Due Process Clause of the Fourteenth Amendment, was based upon the recognition that an individual's interest in life or liberty outweighs the State's financial interest in not spending money on indigents. Above all is the compelling interest of both the State and the individual in accurate dispositions." 470 U.S. at 79. Consequently, when an indigent shows that appointment of an expert would advance the likelihood of an accurate result in his trial, the State's financial interest must yield.

The trial judge should have employed the balancing test outlined in Ake, rather than simply deciding that the expenditure for a jury consultant was unnecessary to assure effective counsel. Under an Ake analysis, three factors are relevant:

> The first is the private interest that will be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probably value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided.

> 470 U.S. at 77.

Applying these factors to the case at bar, the private interest is Mr. Valentine's liberty and life as well. The Ake court termed this interest "almost uniquely compelling." 470 U.S. at 78. The governmental interest affected is the expenditure of public funds. Because Mr. Valentine makes no claim that all capital defendants are entitled to a jury selection consultant, this simply would be a one-time expense for the county. The other governmental interest is the same as Mr. Valentine's - an accurate disposition of the charges against him.

The final factor, probable value of the services of a jury consultant, is more speculative.

Decisions have hinged on the effect of pervasive pretrial publicity concerning the facts of a defendant's own case - e.g., <u>Rideau v. Louisiana</u>, 373 U.S. 723 (1963) - however, massive publicity about an unrelated defendant's case with similar facts has not been evaluated. Certainly the usual remedy for overly prejudicial pretrial publicity - a change of venue - would have been ineffective in the case at bar because the O.J. Simpson trial had unprecedented national coverage at the time of Mr. Valentine's trial. The only way that a fair and impartial jury could be selected was to discover which potential jurors had formed opinions about the Simpson case and then determine whether this opinion could spill over into Mr. Valentine's case. While all experienced trial attorney's have some ability to select a jury, their level of expertise is comparable to a Jack-of-all-trades. The unique circumstance of a defendant being tried for a capital crime when another defendant had received extraordinary media coverage concerning a similar crime demanded greater expertise.

Balancing the three Ake factors, the risk of selecting one or more jurors who would be biased because of the Simpson publicity was unacceptably high. The cost of providing an expert jury consultant for Mr. Valentine was imply not that great. Mr. Valentine's convictions and death sentence may have been the product of a jury which was not impartial. Consequently he was denied the fundamental fairness guaranteed by Fourteenth Amendment due process as well as the Florida Constitution, Article I, sections 9 and 16.

Denying Mr. Valentine the services of an expert jury consultant also implicates the Equal Protection Clause of the Fourteenth Amendment, United States Constitution and the corresponding guarantee of Article I, section 2, Florida Constitution. Certainly a defendant who could have afforded to pay a jury consultant would have done so under the circumstances of the case. If Mr. Valentine had been represented by the Public Defender, he would probably have had a jury consultant. Unlike

14

court-appointed counsel, the Public Defender does not have to receive permission from a judge before employing an outside consultant. If a Public Defender believed the services of an outside consultant are "useful and necessary" in preparation of a defense, the consultant may be hired. §27.54 (3), Fla. Stat. (1993).

Indeed, the affidavit of Rebecca Lynn, the proposed jury consultant, lists Florida as one of the states where she had received public funds. She had also received funds from two of the federal district courts in Florida. Given the fact that Mr. Valentine was facing a death sentence if convicted and the undeniable exposure of probably all of his jurors to the O.J. Simpson publicity, it is hard to imagine any more appropriate case for expenditure of public funds on a jury consultant. Because other indigent defendants have been provided with Rebecca Lynn's services as a jury consultant, Mr. Valentine was denied equal protection when the trial judge refused to authorize an expenditure of public funds in his case.

## GROUND V

**The trial judge erred by denying Appellant's motion to grant defendant the concluding argument to the jury because his presentation of alibi witnesses caused him to lose this valuable procedural right in violation of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments**

The Florida Supreme Court denied this claim as without merit. Valentine v. State, 688 So.2d 313 (Fla. 1996). Fla. R. Crim. P. 3.250 provides:

> In all criminal prosecutions the accused may choose to be sworn as a witness in the accused's own behalf and shall in that case be subject to examination as other witnesses, but no accused person shall be compelled to give testimony against himself or herself, nor shall any prosecuting attorney be permitted before the jury or the court to comment on the failure of the accused to testify in his or her own behalf, and a defendant offering no testimony in his or her own

behalf, except the defendant's own, shall be entitled to the
concluding argument before the jury.

When a defendant chooses to present the testimony of other witnesses, as Mr. Valentine did,

Rule 3.250 requires him to forfeit this "fundamental advantage" and give his closing argument

between the State's opening and final arguments. This penalty requires a defendant to weigh the

possible advantages of presenting favorable witnesses against loss of the concluding argument to the

jury.  The right to present witnesses to establish a defense is a fundamental right element of due

process of law.  Washington v. Texas, 388 U.S. 14 at 19 (1967).  Consequently, a procedural rule

which "cuts down on [a constitutional] privilege by making its assertion costly" may violate due

process. Griffin v. California, 380 U.S. 609 at 614 (1965).

Recent decisions of the United States Supreme Court have established that the defendant's

right to present favorable testimony is not absolute. The appropriate inquiry is the balancing test

described in Rock v. Arkansas, 483 U.S. 44 at 56 (1987):

> In applying its evidentiary rules a State must evaluate whether the
> interests served by a rule justifying the limitation imposed on the
> defendant's right to testify.

The issue at bar should be compared with that in Brooks v. Tennessee, 406 U.S. 605 (1972).

In Brooks, a state procedural rule requiring the defendant testify prior to any other defense witnesses

or else forfeit his right to take the stand was challenged under the Fifth and Fourteenth Amendments.

The Court acknowledged the state's interest in preventing a defendant from being able to tailor his

testimony to conform to that of prior witnesses. However, the Brooks court concluded that this

interest could not outweigh the defendant's right to remain silent:

16

> Pressuring the defendant to take the stand, by foreclosing later testimony if he refuses, is not a constitutionally permissible means of ensuring his honesty.

> 406 U.S. 611.

Fla. R. Crim. P. 3.250 exerts a similar pressure on the defendant to take the stand rather than call defense witnesses and lose the right to open and close argument. Because it impacts on the Fifth Amendment right against self-incrimination without promoting a significant state interest, Fla. R. Crim. P. 3.250 is as constitutionally defective as the Tennessee procedural rule struck down in Brooks.

Analysis under the Compulsory Process Clause of the Sixth Amendment displays another unconstitutional aspect of the rule. The defendant has a fundamental right to offer testimony of witnesses in his favor. Of course, this right is not absolute. In Taylor v. Illinois, 484 U.S. 400 (1988), the Court recognized that the integrity of the adversary process is an important public policy which can outweigh the defendant's compulsory process right if he violates discovery rules.

However, Fla. R. Crim. P. 3.250 has the effect of providing a sanction for every defendant who asserts his right to compulsory process; he loses the preferential order of argument.  Exercise of the Sixth Amendment right cannot constitutionally be burdened with a penalty for every defendant who, like Mr. Valentine, complies with all procedural obligations. Accordingly, the rule should be struck down insofar as it impacts on the Compulsory Process Clause.

Because Mr. Valentine had to give up his right to open and close the arguments to the jury when he presented a defense consisting of testimony other than his own, his trial lacked the fundamental fairness required by the Due Process Clause of the Fourteenth Amendment.  There was also a violation of the Equal Protection provisions of the Florida and U.S.  Constitutions because

treating defendants differently based upon whether they present witnesses on their behalf cannot be justified.

## GROUND VI

**The trial court erred by giving the standard reasonable doubt instruction rather than the one proposed by Petitioner because the language of the standard instruction allows the jury to convict a criminal defendant where a reasonable doubt exists, contrary to the due process clause of the Fourteenth Amendment.**

The Florida Supreme Court denied this claim as without merit. Valentine v. State, 688 So.2d 313 (Fla. 1996).

Prior to trial, Mr. Valentine submitted a "Written Objection to Standard Jury Instruction on Reasonable Doubt/Written Proposed Jury Instruction".  At the motion hearing held July 1, 1994, the court denied the proposed instruction without prejudice to resubmit it at the charge conference. During trial, when the charge conference was held, defense counsel submitted a different proposed instruction on reasonable doubt.  The court noted the language "Defendant's presumption of not guilty" (as opposed to the standard language "defendant's presumption of innocence") and rejected the proposed instruction, calling it a "misstatement."

The Due Process Clause of the Fourteenth Amendment requires a state to prove guilt beyond a reasonable doubt which might lead them to convict upon a lesser standard. Cage v. Louisiana, 498 U.S. 39 (1990); Victor v. Nebraska, 127 L.Ed 2d 583 (1994).  A constitutionally defective instruction on reasonable doubt can never be held harmless error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed 2d 182 (1993).

The trial court denied Mr. Valentine's proposed modification of the standard jury instruction

on reasonable doubt. Accordingly, the jury was instructed in the language of the standard which does not adequately inform the jury of the distinction between their ability to acquit the defendant contrary to the evidence (jury pardon) and their obligation to acquit the defendant if a reasonable doubt is found. This constitutional error is a structural defect which is per se reversal.

### GROUND VII

**Petitioner's conviction for attempted murder in the first degree should be vacated because it may rest on a theory of attempted felony murder - a nonexistent offense.**

The Florida Supreme Court denied this claim, holding:

> Valentine next argues that his conviction for attempted first-degree murder is error. We agree. The jury was instructed on two possible theories on this count, attempted first-degree felony murder and attempted first degree premeditated murder, and the verdict fails to state on which ground the jury relied. After Valentine was sentenced, this Court held that the crime of attempted first-degree murder does not exist in Florida. *See State v. Gray*, 654 So.2d 552 (Fla. 1995). Because the jury may have relied on this legally unsupportable theory, the conviction for attempted first-degree murder must be reversed. *See Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 166 L.Ed 2d 371 (1991).

> This error, we conclude, has no effect on the sentence of death since Valentine was convicted of three other violent felonies (i.e., armed burglary and two counts of kidnapping) arising from the same episode; any one of these other crimes would support the "prior violent felony" aggravating circumstance. Further, even if this aggravating circumstance were not present, we are convinced beyond a reasonable doubt that the trial court still would have imposed the death penalty given the nature and extent of the remaining aggravating and mitigating circumstances. *See State v. DiGuilio*, 491 So.2d 1129 (Fla. 1986). As the trial court pointed out, this was an extraordinarily brutal crime.

> Valentine v. State, 688 So.2d 313 (Fla. 1996).

19

A criminal jury verdict must be set aside when there are two possible grounds, only one of which is legally supportable unless the reviewing court can determine which of the two grounds the jury necessarily relied upon. Yates v. United States, 354 U.S. 298 at 311 (1957). Accord, Stromberg v. California, 283 U.S. 359 (1931) (verdict which might be based on unconstitutional ground cannot stand, even if there are alternative theories to support the verdict); Bachellar v. Maryland, 397 U.S. 564 (1970); Leary v. United States, 395 6 at 31-2 91969). In Griffin v. United States, 502 U.S. 46 (1991) stated:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law - whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

> 502 U.S. at 59.

Basic principles of due process in the federal constitution bar conviction and sentence for a nonexistent offense.

### GROUND VIII

**The sentencing judge erred by finding that the cold, calculated and premeditated aggravating circumstance was proved.**

The Florida Supreme Court denied this claim as without merit. Valentine v. State, 688 So.2d 313 (Fla. 1996).

Each of the three prongs (cold, calculated, and premeditated) must be proved beyond a reasonable doubt as well as absence of any pretense of justification. In the case at bar, there was undoubted proof of calculation and heightened premeditation. However, there was insufficient proof

of the cool and calm reflection necessary to satisfy the coldness prong of the aggravating circumstance.

The United States Supreme Court in <u>Sochor v. Florida</u>, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992) held that Eight Amendment error occurs when the sentencer weighs an "invalid" aggravating factor in reaching the decision to impose a death sentence. In <u>Sochor</u>, Eighth Amendment error occurred when the trial judge weighed the coldness factor. Since the Supreme Court of Florida did not explain or even "declare a belief that" this error "was harmless beyond a reasonable doubt" in that "it did not contribute to the [sentence] obtained,"Chapman, supra, 386 U.S., at 24, 87 S.Ct., at 828, the error cannot be taken as cured by the State Supreme Court's consideration of the case. <u>Id</u>. at 541.

In Mr. Valentine's case, the Sentencing Order recites facts purportedly supporting the CCP aggravating circumstance (R494-5) First, the judge's order states that the shooting of Porche was "an execution." (R494) However, in Florida an execution-style killing in a domestic context has been found insufficient to establish the CCP aggravating factor. <u>See</u>, <u>Santos v. State</u>, 591 So.2d 160 (Fla. 1991).

Second, the sentencing judge speculates that Mr. Valentine's "sole reason to come to Tampa" was to commit murder and notes the advance planning which included bringing weapons and wire to bind the victims. (R494) However, the Florida courts have disapproved findings of the CCP aggravator based upon procuring a weapon and hunting down the victim.  <u>See</u> <u>White v. State</u>, 616 So.2d 21 (Fla. 1993) (defendant redeemed a pawned shotgun and drove to the victim's workplace); <u>Richardson v. State</u>, 604 So.2d 1107 (Fla. 1992) (shotgun previously hidden under the front steps of the victim's trailer).

Third, the sentencing judge focused upon the length of time involved and the fact that the victims were driven to a remote area. In Douglas v. State, 575 So.2d 165 (Fla. 1991) the entire series of events took about four hours. In Mr. Valentine's case, it was about the same amount of time between when Romero was first attacked in her house and when the deputy found her in the field. See also, Farinas v. State, 569 So.2d 425 (Fla. 1990) (kidnapping of victim insufficient to prove CCP).

The cold, calculated and premeditated aggravating factor was improperly found under the circumstances of this case. Although the homicide showed prior planning, it was the product of inflamed emotions. In similar lover's triangle type cases, the state court's have rejected application of the CCP aggravator. The state court's application of federal law was contrary to Sochor v. Florida.

### GROUND IX

**The sentencing judge rejected the statutory mitigating circumstance based upon evidence that Petitioner was incarcerated for two years in Costa Rica, his federal prison sentence for an immigration violation, and several arrests reported in the presentence investigation. Of these, only the federal sentence for an immigration violation should have been considered and it did not amount to significant criminal activity.**

The Florida Supreme Court denied this claim as without merit. Valentine v. State, 688 So.2d 313 (Fla. 1996).

The sentencing judge unreasonably rejected several mitigating circumstances which Valentine established. These were the statutory mitigating circumstances of "no significant history of prior criminal history of prior criminal activity" and the nonstatutory factors of (1) potential for rehabilitation, (2) providing care and financial support for his daughter, and (3) prior domestic

22

relationship between Livia Romero and Valentine.

The state court's rejection of several mitigation circumstances was a violation of <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978).  In <u>Lockett</u> the Court established the bedrock Eighth Amendment principle that emanates from "the fundamental respect for humanity underlying the Eighth Amendment, [which mandates the] ... consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." <u>Id</u>. at 304. Under <u>Lockett</u>, the sentencer must be permitted to give "independent mitigating weight" to all evidence proffered in mitigation. <u>Id</u>. at 605.

The sentencing judge unreasonably rejected the statutory mitigating circumstance based upon evidence that Petitioner was incarcerated for two years in Costa Rica, his federal prison sentence for an immigration violation, and several arrests reported in the presentence investigation. Of these, only the federal sentence for an immigration violation should have been considered and it did not amount to significant criminal activity.

## GROUND X

**Petitioner was denied the effective assistance of counsel at the guilt and sentencing phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United states and the corresponding provisions of the Florida Constitution.  Trial counsel failed to object to blatant prosecutorial conduct on the part of State Attorney Karen Cox due to her repeatedly using the name Livia Porche or otherwise implying that Mr. and Mrs. Valentine were no longer married.**

The Florida Supreme Court denied this claim stating:

> During the guilt phase, Romero testified that she divorced Valentine and married Ferdinand Porche in Louisiana. However, during Romero's cross-examination, defense counsel demonstrated that no record existed of either the divorce or the subsequent marriage to Porche. At Valentine's postconviction evidentiary hearing, the prosecutor who tried Valentine's case explained that there "was a big issue of whether or not [Valentine and Romero] had a valid divorce" and that she never fully resolved the issue because "Louisiana records and laws were very different to get to the bottom of." The prosecutor also explained that Romero held herself out as Livia Porche and believed herself married to Porche and that Romero was addressed accordingly at trial. Valentine's guilt phase counsel also testified at the hearing and explained that he had determined that Valentine and Romero had never actually become divorced. He then explained that he had proven this fact to the jury by impeaching Romero through the introduction of Louisiana records which showed that no divorce of marriage involving Romero had occurred.
> ....
>
> Here, Valentine has not demonstrated deficiency under *Strickland*. Defense counsel's decision to impeach Romero through the introduction of documents that proved that she was still married to Valentine and had not married Porche was a reasonable strategic decision that would have undermined Romero's credibility in the eyes of the jury. *See* Charles W. Ehrhardt, *Florida Evidence* § 608.6 (2012 ed.) ("[T]he credibility of a witness may be attacked by evidence tending to contradict a material fact stated in the testimony of the witness."); *see also Eaton Corp. V. Votour*, 895 So.2d 466, 468 (Fla. 1st DCA 2005) (explaining that a witness's credibility is called into

question when that witness is impeached by contradiction). Indeed, defense counsel testified at the evidentiary hearing that the use of the name Livia Porche and the portrayal of Romero could not be married to Valentine and Porche at the same time. Counsel made a strategic decision to impeach Romero and was not, therefore, deficient in his

performance. *See Occhicone*, 768 So.2d at 1048.

Accordingly, because Valentine has not demonstrated deficiency under *Strickland*, we affirm

the trial court's denial of relief. Valentine v. State, 98 So.3d 44 (2012).

Case law is clear that the defendant had an absolute right to attack this ineffective assistance

of counsel claim in a collateral proceeding.   Massaro v. U.S., 538 U.S. 500 (2003) holds in part:

> An ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could ha ve raised the claim on direct appeal.  Requiring a criminal defendant to bring ineffective-assistance claims on direct appeal does not promote the procedural default rules objectives: conserving judicial resources and respecting the law's important interest in the finality of judgements.  Applying that rule to ineffective-assistance claims would create a risk that defendants would feel compelled to raise the issue before there has been opportunity fully to develop the claims factual predicate, and would raise the issue for the first time in a forum not best suited to assess those facts,... Id. at 504.

The reasoning for why an evidentiary hearing was properly allowed on this issue is further

detailed in Allen v Butterworth, 756 So.2d 52 (Fla. 2000):

> In addition to the unnecessary delay and litigation concerning the disclosure of public records, we have identified another major cause of delay in post-conviction cases as the failure of the circuit courts to grant evidentiary hearings when they are required.  This failure can result in years of delay.  This Court has been compelled to reverse a significant number of cases due to this failure.  When a case gets reversed for this reason, the entire system is put on hold, as the hearing on remand takes many months to be scheduled and completed, and the appeal therefrom takes many additional months in order for the record on appeal to be prepared and the briefs to be filed in this Court.  In order to alleviate this problem, our proposed

25

rules require that an evidentiary hearing be held in respect to the initial motion in every case. This single change will eliminate a substantial amount of the delay that is present in the current system

Id. at 66,67.

Mr. Valentine was rightfully granted an evidentiary hearing on his claim that trial counsel was ineffective for failing to object to the prosecutorial misconduct at the trial level. Trial counsel failed to preserve the record concerning this issue for an attack on direct appeal. This issue was raised through the evidentiary hearing testimony of Terence Valentine, (PCR Vol. XVIII p. 317), Karen Cox (PCR Vol. XIX p. 390-405), and Simson Unterberger (PCR Vol. XX p. 435-442). This issue was properly litigated, thoroughly, throughout the evidentiary hearing, through three witnesses. The State never objected to the issue being raised, or about the line of questioning.

The closest the State ever came to a challenge, was when they objected to a question posed to Simson Unterberger about Ms. Cox's reputation in the community regarding her ethics or veracity. (PCR Vol. XX p. 441). The question was allowed through rephrasing. (PCR Vol. XX p. 442-443). The State, and most importantly, this Court, allowed the door to be opened on this issue with evidence presented. It was the proper decision.

By using the name of Livia Porche, Karen Cox was falsely labeling the name of a victim/witness to confuse the jury. She was getting her practice in, so to speak, for her later actions as a United States Attorney in a case called United States v. Sterba, 22 F.Supp.2d 1333 (M.D. Fla. 1998). The Florida Supreme Court ordered Cox to be suspended from the practice of law for one year due to her actions in Sterba. The Florida Bar v. Karen Schmid Cox, 794 So.2d 1278, 1287 (Fla. 2001). In Sterba, Karen Cox, in her role as an assistant United States Attorney, knowingly placed a witness on the stand under an alias. Id. at 1279. The witness' actual name was Adria Jackson, but

Ms. Cox had the witness testify under her fictitious confidential informant (CI) name, "Gracie Greggs". Id. These actions prevented Mr. Sterba from knowing the true identity of his accuser; including the knowledge that she had a criminal record. Id. at 1280.

The subterfuge was discovered by the defense during the middle of the trial, and they successfully moved for a mistrial-- which was charged to the state–mandating a dismissal with prejudice. Id. As the Court wrote in Cox:

> We can think of no greater "significant...adverse effect on the legal proceeding" than a dismissal with prejudice of a criminal indictment due to a prosecutor's misconduct. Equally important, Cox's misconduct involved "potentially serious injury to a party," namely the criminal defendant, Sterba, whose rights to a fair trial, confrontation, and due process would have been denied had Cox's misconduct not be revealed. Id. at 1284.

The Court went on to say of Cox:

> Cox failed to heed her duty to represent the public fairly and justly in her role as a prosecutor, and damaged the public by undermining the confidence in the very core of the judicial process in search of the truth. The public clearly deserves protection from a prosecutor who determines on her own when and how to follow the rules. Id. at 1286.

In the case before this court, it is easy to see how Karen Cox was simply getting her practice in on how to deceive a judicial proceedings which she took to another level in Sterba. Karen Cox was clearly aware that Livia Romero never became Livia Porche. She still repeatedly called her "Porche" to deceive the jury. Simson Unterberger testified that he knew the defendant was still married to Livia at the time of the offense. (PCR Vol. XX p. 437-439). Yet he was blatantly deficient in allowing the false testimony to appear before the jury.

The prejudice is clear because it appeared to the jury that Livia went through the horror of seeing her "husband" tortured and murdered before her very eyes, as opposed to the person she was

27

seeing while legally married to Mr. Valentine.  The subtle references hammered thoughts of Livia

Porche/Mrs. Porche/Wife of Ferdinand Porche home to the jury.  The result was fundamentally

unfair in that the jury was completely mislead by Karen Cox.  They were deceived, and trial counsel

allowed it to happen.  The prejudicial effect made it appear as though Terence Valentine was a

deranged ex-husband attacking a happily married couple.  If Ms. Cox had never engaged in such

tactics, Mr. Valentine never would have been convicted by the passionately inflamed jury.

In Ruiz v. State, 743 So.2d 1 (Fla. 1999), this same prosecutor, Karen Cox, used something

called the "Desert Storm" argument in the penalty phase closing argument.  The Court stated in

Ruiz:

> This blatant appeal to jurors' emotions was improper for a number
> of reasons: it personalized the prosecutor in the eyes of the jury and
> gained sympathy for the prosecutor and her family; it contrasted the
> defendant (who at that point had been convicted of murder)
> unfavorably with Ms. Cox's heroic and dutiful father; it put before
> the jury new evidence highly favorable to the prosecutor; it
> exempted this new evidence from admissibility requirements and
> from the crucible of cross-examination; and most important, it
> equated Ms. Cox's father's noble sacrifice for his country with the
> jury's moral duty to sentence Ruiz to death.
>
> The State argues that because defense counsel failed to object to
> several of the prosecutor's guilt and penalty phase statements he is
> barred from raising this issue on appeal.  We disagree.  When the
> properly preserved comments are combined with additional acts of
> prosecutorial overreaching set forth below, we find that the integrity
> of the judicial process has been compromised and the resulting
> convictions and sentences irreparably tainted.  Id. at 7.

On September 26, 2001, a formal complaint was filed with the Supreme Court of Florida

which was directed toward the actions of Karen Cox in her capacity as an Assistant State Attorney.

Ultimately, it was the finding of the referee that Cox did in fact violate Rule 4-3.4(e) ( a lawyer shall

not in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will

not be supported by admissible evidence, assert personal knowledge of facts in issue except when

testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a

witness, the culpability of a civil litigant, or the guilt or innocence of an accused); Rule 4-3.5(a) (

a lawyer shall not seek to influence a judge, juror, prospective juror, or other decision maker except

as permitted by law or the rules of court).

The Florida Bar News of April 1 2002, page 9 DISCIPLINARY ACTIONS reported the

following action:

> **Karen Schmid Cox**, P.O. Box 3913, **Tampa, suspended** from
> practicing law in Florida for 30 days, to run concurrent with the one
> year suspension entered in Case No. SC96217 (effective June 18,
> 2001), following a January 31 court order.  (*Admitted to practice:*
> 1985) In two unrelated cases in which Cox was acting as a
> prosecutor, she made improper statements during closing arguments.
> In one case, Cox implied that the defendant would not have been
> prosecuted if he was not guilty.  (Case No. SC01-2148).

Ms. Cox has a long history of judicial prosecutorial misconduct, and it was indeed demonstrated

throughout the trial of Mr. Valentine.  The acts of prosecutorial overreaching set forth above has

compromised the judicial process and the resulting convictions and sentences are tainted by

prosecutorial misconduct.  Karen Cox pulled the fraud off in open court, and counsel allowed it to

happen.  If the jury had known the truth, Mr. Valentine would have been acquitted on the charge of

first degree murder.

29

## GROUND XI

**The lower court erred in summarily denying Petitioner a hearing on all of Claim XI (6), which alleged that trial counsel was ineffective for failing to object to multiple examples of prosecutorial misconduct during closing argument, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the corresponding provisions of the Florida Constitution.**

The Florida Supreme Court denied this claim stating:

> Valentine first alleges that the prosecutor argued facts not in evidence during closing arguments by stating: "[Defense Counsel] says that the shooting didn't happen in the back seat of the Blazer, but he ignores the testimony of Dr. Miller that said that there is blood spatter on this Blazer" and that defense counsel's failure to object to this statement denied him the effective assistance of counsel.

> We have previously explained that counsel cannot be deemed ineffective for failing to object to a fair comment which is based on the evidence presented during trial. *Spann v. State*, 985 So.2d 1059, 1068 (Fla. 2008) (citing *Mungin v. State*, 932 So.2d 986, 997 (Fla. 2006)). Here, the officer who photographed the Chevy Blazer in which Porche's body was found testified that the photos he took showed blood spatter throughout the Blazer. The forensic pathologist who autopsied Porche's body also noted that the photos showed that there was blood spatter in the Blazer. Because the prosecutor's comment was supported by the evidence, counsel cannot be deemed ineffective for failing to object. *See Schoenwetter v. State*, 46 So.3d 535, 546 (Fla. 2010) ("[C]ounsel cannot be deemed ineffective for failing to make a meritless objection.") (quoting *Hitchcock v. State*, 991 So.2d 337, 361 (Fla. 2008)).

Valentine v. State, 98 So.3d 44 (Fla., 2012)

As discussed in Issue IX above, Massaro v. U.S., 538 U.S. 500, 504 (2003) and Allen v Butterworth, 756 So.2d 52, 66-67 (Fla. 2000) clearly discuss the importance of post-conviction counsel raising the claim via collateral attack.  The trial court erred in issuing a summary denial.

30

During closing argument, the assistant state attorney, Karen Cox, told the jury:        *" M r .*

*Unterberger says that the shooting didn't happen in the back seat of the Blazer, but he ignores the*

*testimony of Dr. Miller that said that there is blood spatter on this Blazer..."*   (FSC ROA Vol. XV

p. 1727).   However, there is no evidence or testimony that Dr. Miller examined the Blazer.   Dr.

Miller did not testify that there was any blood spatter on the Blazer.   Ms. Cox made an improper

reference to matters not in evidence, intended to inflame the jury.

During closing argument, the assistant state attorney, Karen Cox told the jury:

> "Now, Mr. Unterbeger wants you to believe that she [Livia] is lying
> and to have you believe that she is lying, he has to provide you with
> a motivation for why she was lying and so her  motivation is this
> Costa Rican divorce.  He somehow wants you to believe and wants
> to suggest to you that it is this woman, she was laying there, bound
> bloodied, naked, wondering if she was going to live or die, not
> knowing if she would ever see her children again, she thought 'Hey,
> if I say Terance did it, maybe he has got some property in Costa Rica
> and I will get an attorney, and we will do a property search, and
> maybe I will get half..." (FSC ROA Vol. XV p. 1724).

Ms. Cox  made improper  comments expressing her personal beliefs concerning defense

counsel's presentation of his case and improperly attacked opposing counsel's theory of defense.

See United States v. Young, 105 S. Ct. 1038 (1985).  It is impermissible for a prosecutor to criticize

defense counsel's closing argument or ridicule a defendant or his theory of defense.  See Riley v.

State, 560 So.2d 279, 280 (Fla. 3d DCA 1990); Rosso v. State, 505 So.2d 611, 612 (Fla. 3d DCA

1987).

In this case, the prosecutor continued beyond the limits of proper and ethical prosecutorial

conduct.  In closing, the prosecutor commented on facts not in evidence and interjected improper

personal comments.  This case is yet another example where the prosecutor's over zealousness in

31

prosecuting the State's cause worked against justice rather than for it. Gore v. State, 719 So.2d 1197, 1203 (Fla.1998) (quoting Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984)). See Ruiz v. State, 743 So.2d 1 (Fla. 1999); Kellogg v. State, 761 So.2d 409 (Fla. 2d DCA 2000).

In Ruiz, the Defendant was convicted in the Circuit Court, Hillsborough County, of first-degree murder and sentenced to death. Mr. Ruiz appealed. The Florida Supreme Court held that the prosecutor, the same Karen Cox, engaged in misconduct in closing arguments. The court reversed the conviction and vacated the sentence because of prosecutorial misconduct.

In Ruiz, as here, the defendant presented an alibi defense, claiming that he was in Orlando on the day of the murder. Several witnesses attested to this. At the conclusion of the evidence, Ruiz was convicted and charged. On appeal, Ruiz argued, inter alia, prosecutorial misconduct on the part of Karen Cox during closing argument. The Florida Supreme Court agreed.

"A criminal trial provides a neutral arena for the presentation of evidence upon which alone the jury must base its determination of a defendant's innocence or guilt. Attorneys for both sides, following rules of evidence and procedure designed to protect the neutrality and fairness of the trial, must stage their versions of the truth within that arena. That which has gone before cannot be considered by the jury except to the extent it can be properly presented at the trial and those things that cannot properly be presented must not be considered at all." Ruiz, 743 So.2d at 4.

The role of the attorney in closing argument is "to assist the jury in analyzing, evaluating and applying the evidence. It is not for the purpose of permitting counsel to "testify" as an expert witnesses ." The assistance  permitted includes counsel's right to state his contention as to the conclusions that the jury should draw from the evidence." United States v. Morris, 568 F.2d 396, 401 (5th Cir. 1978). "To the extent an attorney's closing argument ranges beyond these boundaries it is

improper.  Except to the extent he bases any opinion on the evidence in the case, he may not express his personal opinion on the merits of the case or the credibility of witnesses.  Furthermore, he may not suggest that evidence which was not presented at trial provides additional grounds for finding defendant guilty." Ruiz, 743 So.2d at 4.

The witnesses for both the State and the defense were subjected to extensive cross-examination and impeachment, and the credibility of each was called into question.  During closing argument, prosecutor Cox sought to bolster the credibility of the State's case with the following improper statements:

> [MS. COX:] What motive does anybody in the world have to do this to Livia Proche except the man who so hated her and who thought that she was keeping him from his child and who thought that she had his belongings and that they were rightfully his?
> What other person in the world would do this to Livia Porche and Ferdinand Porche and, before taking them out of the scene, would take the time and the trouble to subject her to the degradation having photos of her mother and photos of her husband children shredded and dropped over her body?
> Who else would do this type of commando raid into that house and really not take anything except the life of her husband?  Who else was calling her and telling her to disappear?  No one.  No one in the world.
> (FSC ROA Vol. XV p. 1723).

Mr. Valentine's convictions are irreparably tainted.  The record shows that this trial was permeated by egregious and inexcusable prosecutorial misconduct.  Ms. Cox attempted to tilt the playing field and obtain a conviction and death sentence in a number of improper ways: by demeaning and ridiculing the defendant and his counsel; by appealing to the jurors' raw emotions; and by introducing improper evidence.

The prosecutor crossed the line of zealous advocacy by a wide margin and compromised the

integrity of the proceeding.  See Garcia v. State, 622 So.2d 1325, 1332 (Fla. 1993) ("Once again, we are compelled to reiterate the need for propriety, particularly where the death penalty is involved....")

Nowitzke v. State, 572 So.2d 1346, 1356 (Fla. 1990) ("[W]e are distressed over the lack of propriety and restraint exhibited in the overzealous prosecution of capital cases, and we feel compelled to reiterate [the warning expressed in Bertolotti]."); Garron v. State, 528 So.2d 353, 359 (Fla. 1988) ("Such violations of the prosecutor's misconduct in several death penalty cases...This Court considers this sort of prosecutorial misconduct, In the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings."); Urbin V. State, 714 So.2d 411 (Fla. 1998) (reversing death sentence and condemning extensive prosecutorial misconduct).

The cumulative effect of the prosecutor's improper conduct constitute fundamental error. Here, the prosecutor made an attack on defense counsel, commented on a matters not in evidence, invaded the jury's providence , bolstered the officers, bolstered the state witness, and shifted the burden of proof.  This is the type of error which reaches down into the validity of the trial itself, to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.  See McDonald v. State, 743 So.2d 501 (Fla. 1999). Here, the prosecutor's comments were so prejudicial as to vitiate the entire trial. McDonald at 505.

Fundamental error in closing occurs when the "prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Silva v. Nightingale, 619 So.2d 4, 5 (Fla. 5th DCA 1993). The cumulative effect of the prosecutor's improper comments vitiated the fairness of the appellant's trial.  See Caraballo v. State, 762 So.2d 542 (Fla. 5th DCA 2000).

Here, the cumulative effect of the prosecutor's improper comments deprived Mr. Valentine

34

of a fair trial.  See Brown v. State, 593 So.2d 1210 (Fla.2d DCA 1992) (holding that a combination of improper comments made by the prosecutor during closing argument required reversal and remand for a new trial). Accordingly, Mr. Valentine's judgment of conviction and sentence must be vacated and set aside. See Ruiz.

Trial counsel was ineffective under Strickland, for failing to object to these numerous example of prosecutorial misconduct.  Had he done so, Mr. Valentine would have been acquitted, as the objections would have been sustained, and Ms. Cox reprimanded.  Moreover, the issues would have been properly preserved for direct appeal, and subsequently Mr. Valentine's conviction would have been reversed due to reversible error.

In Davis v. State, 648 So.2d 1249 (Fla. 4th DCA 1995) at 1249, the court held: "that trial counsel's failure to object to reversible error, while waiving the point on direct appeal, does not bar a subsequent, collateral challenge based on a claim of ineffective assistance of counsel."

In Vento v. State, 621 So.2d  493 (Fla. 4th DCA 1993), at 495, the court held: "The question then becomes one of whether trial counsel's failure to object on these three interrelated grounds was a deficiency from the professional norm which prejudiced his defense.  Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   In our view appellant has established ineffectiveness on these three grounds."

 Pursuant to the case law cited above, Mr. Valentine should have been granted an evidentiary hearing and it was error for the lower court to deny him a hearing on this claim. Trial counsel's failure to object to the improper prosecutorial arguments of Assistant State Attorney Cox prejudiced Mr. Valentine. Trial counsel's arguments were denigrated and the State's witnesses were bolstered.

The effect of the State's arguments led the jury to believe that defense arguments were

unworthy and that the State's witnesses should be believed. The overall effect of the State's arguments prejudiced Mr. Valentine by ensuring that the jury would sentence Mr. Valentine to death.

### GROUND XII

**The lower court erred in holding that Petitioner was not denied the effective assistance of counsel at the sentencing phase of his capital trial, in violation of the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States and the corresponding provisions of the Florida Constitution.   Trial counsel failed to adequately challenge the State's case, counsel's performance was deficient, and as a result the death sentence is unreliable.**

In Ake v. Oklahoma, 470 U.S. 68, 80-1, 105 S.Ct. 1087, 1095 (1985) The Supreme Court of the United States held:

> [T]hat when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense.  In this role, psychiatrists gather facts, through professional examination, interviews, and elsewhere, that they will share with the judge or jury; they analyze the information gathered and from it draw plausible conclusions about the defendant's mental condition, and about the effects of any disorder on behavior; and they offer opinions about the effects of any disorder on behavior; and they offer opinions about how the defendant's mental condition might have affected his behavior at the time in question.  They know the probative questions to ask of the opposing party's psychiatrists and how to interpret their answers. Unlike lay witnesses, who can merely describe symptoms they believe might be relevant to the defendant's mental state, psychiatrists can identify the "elusive and often deceptive" symptoms of insanity Solesbee v. Balkcom, 339 U.S. 9, 12, 70 S.Ct. 457, 458, 94 L. Ed. 604 (1950), and tell the jury why their observations are relevant.  Further, where permitted by evidentiary rules, psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefor offer evidence in a form that has meaning for the task at hand.  Through this process of

36

> investigation, interpretation, and testimony, psychiatrists ideally
> assist lay jurors, who generally have no training in psychiatric
> matters, to make a sensible and educated determination about the
> mental condition of the defendant at the time of the offense. Id. At
> 80-1 **1095

In Mr. Valentine's case the "elusive and often deceptive" symptoms of insanity were neither

elusive nor were they deceptive.  Mr. Valentine's grandiose mood swings were obvious upon

listening to the taped conversations between Mr. Valentine and the surviving victim.  A mental

health professional would have explained to the sentencing Court why these taped conversations

were relevant to prove mania and by extension, the statutory mitigator. The testimony of Mr.

Valentine's sister detailing the head injuries that Mr. Valentine suffered as a child prompted Dr. Dee

to give Mr. Valentine a battery of neuro-psychological tests which revealed frontal lobe damage.

These tests results further established the statutory mitigator of extreme mental or emotional distress.

The trial court knew nothing about Mr. Valentine's mental state and neither did his own defense

team.

In Hildwin v. Dugger, 654 So.2d 107 (Fla. 1995), the Florida Supreme Court held that trial

counsel's performance at sentencing was deficient and woefully inadequate where trial counsel failed

to unearth a large amount of mitigating evidence which could have been presented at sentencing.

Counsel presented limited testimony of lay witnesses.  Hildwin at 110fn.7. in Hildwin, at the 3.850

hearing, experts testified that the defendant was under the influence of extreme mental or emotional

disturbance and that his capacity to appreciate the  criminality of his conduct or to conform his

conduct to the requirements of the law was substantially impaired.  Hildwin's sentence was vacated.

In Mr. Valentine's trial, Mr. Lopez called two lay witnesses; first called was one Iris B. Sterling

(FSC ROA Vol. XVI p. 1821-1828).  Ms. Sterling was a longtime friend of the Valentine family and

saw Terance grow up.  (FSC ROA Vol. XVI p. 1823). She described Mr. Valentine as a normal boy, very respectful, an excellent athlete, very tender around small children and enjoyed a normal relationship with his brothers and sisters. (FSC ROA Vol. XVI p. 1823-25). Her testimony can best be described as "nice guy mitigation".

Mr. Lopez then called Frances Valentine Pineda.  (FSC ROA Vol. XVI p. 1829-1841).  Ms. Valentine-Pineda is the defendant's older sister.  (FSC ROA Vol. XVI p.1829). She described defendant as a very mischievous child, liked to move around a lot and was a nice brother. (FSC ROA Vol. XVI p. 1830).  The "elusive and often deceptive" symptoms are detailed thusly:

> Q.  You said he was very talkative.  Can you tell us more about this very talkative young man?
> A.  Yes.  He used to like to brag a lot, brag, say things that – tell lies sometimes to feel hisself important.  He used to like to fill up stories to make himself very important.
> Q.  And when he built these stories, when he made up these stories, it was always to make himself more important?
> A.  Yes, was to make – we look at him like something very, very, special.   He liked to – he liked to be special. (FSC ROA Vol. XVI p.1830-31)

As Dr. Dee's testimony to the post-conviction court detailed, this was an example of hypomanic or manic behavior.  A qualified mental health professional doing more than a clinical examination with the defendant's lawyer present would have caught this and would have been able to explain to the trial court the ramifications of this testimony.  An important statutory mitigator would have been established.   Relief is both necessary and proper.  Furthermore, the following testimony should have been investigated by a qualified mental health professional:

> Q.  Did he have any serious childhood diseases that may have had a lasting effect on him?
> A.  Well, he had ordinary children diseases, chickenpox.  Measles, is

38

that what you call it?

Q. Measles.

A. Something like that, and then he, *if he run around a lot, he fall. He fall twice when he was a baby.  He fall and he was unconscious and had to go to the hospital when he was a baby.  He fell out of my hands and afterwards, when he was a small child, a small infant more or less, he fell again, and he had to go to the hospital for a few days.(*emphasis added) (FSC ROA Vol. XVI p.1831-32).

It is clear that trial counsel was asking the correct questions to establish statutory mitigation; but the further investigation needed to establish the statutory mitigation was abandoned.

The United States Supreme Court clearly enunciated the duty of a lawyer to investigate when it cited ABA standards in <u>Rompilla v. Beard</u>, 125 S.Ct. 2456, 2466 (U.S., 2005) stating "[i]t is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction." Instead of relying on a three hour clinical interview; an interview which consisted of self-reporting with the defendant's lawyer present and with no data from Valentine's relatives, trial counsel should have ordered a complete sixteen hour battery of neuro-psychological testing.  Such testing would have confirmed that Valentine, although a very intelligent man, was suffering from frontal lobe damage in addition to mania and would have further established the statutory mitigation of extreme mental or emotional disturbance. Trial counsel instead merely provided Gamache with records of Mr. Valentine's incarceration to establish the non-statutory mitigator of adaptability to prison life.  Trial counsel did not comply with his basic duty to the detriment of Mr. Valentine. Relief is proper.

The Florida Supreme Court in <u>Orme v. State</u>, 896 So.2d 725, 732 (Fla. 2005) held that:

> The trial court concluded in its order denying postconviction relief
> that Orme's defense counsel acted reasonably by not presenting

39

bipolar disorder as a defense during the guilt phase and as a mitigator during the penalty phase, stating that there was some disagreement on how to diagnose Orme at the time of trial and at the postconviction proceeding, even with the additional information presented. The court noted that because the experts agreed that Orme was addicted to cocaine, and the drug addiction was a factor in his murder trial, it was reasonable for trial counsel to present only this evidence. We disagree and find that counsel's performance was deficient in both the investigation of Orme's mental health and the presentation of evidence of Orme's mental illness to the jury. Id. at 732

In Orme, some mental mitigation evidence was known to counsel before trial and the defendant was evaluated. In Mr. Valentine's case, upon learning of Mr. Valentine's history of head injury; a proper evaluation should have been ordered. Trial counsel abandoned the mitigation investigation. Relief is proper under Orme.

In Ragsdale v. State, 798 So.2d 713 (Fla. 2001), the Florida Supreme Court held that trial counsel failed to conduct a reasonable investigation into the defendant's background for possible mitigation evidence where counsel failed to present evidence of a head injury after childhood accidents. After the accidents, Ragsdale went through behavioral changes in which he would violently "snap" over anything. Experts at the postconviction hearing testified that Ragsdale was under extreme mental and emotional disturbance and was unable to conform his conduct to the requirements of the law. Ragsdale's sentence was vacated and remanded for a new penalty phase. As in Ragsdale, Mr. Valentine suffered a childhood brain injury and was hospitalized according to Frances Pineda. Mr. Valentine was evaluated by Dr. Dee and was found to be brain damaged. "Defense counsel failed to take any steps to uncover mental health mitigation evidence that was readily available and his performance did not fall within the wide range of reasonable professional assistance." Baxter v. Thomas, 45 F.3d 1501, 1514 (11th Cir. 1995). Had trial counsel retained a

proper expert to explain the childhood brain injury, the sentencer would have imposed life over death. As it was, Mr. Valentine was deprived of a fair adversarial testing of the evidence due to trial counsel's ineffectiveness. Relief is proper under <u>Ragsdale</u> and <u>Baxter</u> and a new penalty phase is the remedy.

In <u>Wiggins v. Smith</u>, 123 S.Ct. 2527 (2003) the Supreme Court of the United States ultimately held that "The performance of Wiggins' attorneys at sentencing violated his Sixth Amendment right to effective assistance of counsel." <u>Id</u>. at 2529. Justice O'Connor, in delivering the opinion of the Court, stated:

> We established the legal principles that govern claims of ineffective assistance of counsel in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.,* at 687, 104 S.Ct. 2052. To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.,* at 688, 104 S.Ct. 2052. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Ibid.*

The performance of trial counsel in Mr. Valentine's case fell below prevailing professional norms. The deficiencies of counsel extended to the investigative and preparation aspect of the case. Mr. Valentine is entitled to relief under <u>Wiggins</u>. In <u>Wiggins</u>, the investigation regarding mitigation was abandoned, leads were not pursued. In Mr. Valentine's' case, Lopez failed to do even a cursory investigation. The Supreme Court of the United states further held in <u>Wiggins:</u>

> Counsel did not conduct a reasonable investigation. Their decision not to expand their investigation beyond a presentence investigation (PSI) report and Baltimore City Department of Social Services (DSS)

41

records fell short of the professional standards prevailing in Maryland in 1989. Standard practice in Maryland capital cases at that time included the preparation of a social history report. Although there were funds to retain a forensic social worker, counsel chose not to commission a report. Their conduct similarly fell short of the American Bar Association's capital defense work standards. Moreover, in light of the facts counsel discovered in the DSS records concerning Wiggins' alcoholic mother and his problems in foster care, counsel's decision to cease investigation when they did was unreasonable. Any reasonably competent attorney would have realized that pursuing such leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of aggravating factors from Wiggins' background. Indeed, counsel discovered no evidence to suggest that a mitigation case would have been counterproductive or that further investigation would have been fruitless, thus distinguishing this case from precedents in which this Court has found limited investigations into mitigating evidence to be reasonable. Id. at 2530.

Frances Pineda provided mitigation which should have been further explored and investigated by trial counsel. Due to trial counsel's ineffectiveness, he was unable to establish a statutory mitigator. The mitigating evidence which counsel failed to further investigate and which was presented at the 3.851 was powerful. The evidence of head injury suffered in childhood and infancy was never provided to Dr. Gamache. The lack of impulse control and symptoms of mania were documented by Mr. Valentine's sister Frances and by the taped conversations Valentine had with the surviving victim and his daughter before his capture. The testimony of Dr. Dee at the evidentiary hearing clearly established the statutory mitigator of extreme mental or emotional disturbance. The sentence of death is the prejudice suffered by Mr. Valentine. It is clear from the testimony of Walter Lopez that although he had asked Pineda about the mania and the head injury, he had no idea what that evidence meant in terms of statutory mitigation as he was unaware of that particular statutory mitigator. In assessing the reasonableness of an investigation and the "tactical

42

decisions" resulting from that investigation, the <u>Wiggins</u> Court further held:

> In assessing the reasonableness of an attorney's investigation however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Even assuming Schiaich and Nethercott limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather a reviewing court must consider the reasonableness of the investigation said to support that strategy. <u>Id</u>. at 2538.

In Mr. Valentine's case, the obvious facts elicited at the evidentiary hearing that Mr. Valentine was given a battery of neuro-psychological tests based on Frances Valentine Pineda testifying that Valentine fell down a lot and was dropped on his head and hospitalized. Dr. Dee further investigated this evidence. Walter Lopez did not. Relief is proper under <u>Wiggins</u>.

In <u>Torres-Arboleda v. Dugger</u>, 636 So.2d 1321 (Fla. 1994), the Florida Supreme Court stated:

> However, we do find merit to Torres-Arboleda's claim in issue three that defense counsel rendered ineffective assistance of counsel during the penalty phase. The original sentencing court found two aggravating circumstances and no mitigating circumstances. The only mitigating evidence that counsel presented during the penalty phase was the expert testimony of clinical psychologist Dr. Mussenden, who testified that Torres-Arboleda was very intelligent and an excellent candidate for rehabilitation. <u>Id</u>. At 1325.

Mr. Valentine contends that the testimony of Dr. Mussenden was much like the bland stipulation of Dr. Gamache that Valentine would do well in prison. The <u>Torres-Arboleda</u> Court went on to hold:

> During the 3.850 hearing, collateral counsel presented substantial mitigation evidence that trial counsel could have discovered if he had conducted a reasonable investigation of Torres-Arboleda's background. Documentary evidence showed that Torres-Arboleda had a history of good behavior during his incarceration in California,

43

had no police record in Colombia, and had attended a university in Colombia.   These documents should have been considered in mitigation as such factors may show potential for rehabilitation and productivity within the prison system.  *See Stevens v. State,* 552 So.2d 1082, 1086 (Fla. 1989) *Holsworth v. State* 522 So.2d 348, 354 (Fla. 1988).   Additionally, these documents could have provided independent corroborative data for Dr. Mussenden's opinion that the defendant had a good potential for rehabilitation.   Instead, Dr. Mussenden relied upon the defendant's self-report and some psychological tests as the basis for his opinion.   Testimony at the postconviction proceeding also revealed that Torres-Arboleda grew up in abject poverty in Colombia, was a good student and child, and supported his family after his father's death.  Such evidence of family background and personal history may be considered in mitigation.  Id. at 1325.

The bizarre, rambling testimony of penalty phase counsel at the evidentiary hearing begs further analysis. Firstly, Lopez's statement that he never expected the case to go to penalty phase (PCR Vol. XIX p. 384) is stunning in itself. There was a live witness who was shot in the head by the defendant and lived to testify about the suffering of Ferdinand Porche.  The alibi witnesses' testimony was vitiated by the fact that it was years before they came forward with this alibi, they did not immediately inform the American Embassy in 1989 that Mr. Valentine was at "the day of the child celebration". Lopez's naive statement that he didn't think the case would go to penalty phase ignores one basic fact of human nature; people rarely lie about the folks who shoot them in the head. Secondly, Lopez relied on a three hour clinical interview done by William Fuente and Dr. Gamache. The testimony of Frances Valentine Pineda clearly was a lead (the history of head injury as were the taped conversations which Valentine had with the surviving victim and his daughter) which should have been provided to Dr. Gamache .   Gamache could have done a complete battery of neuro-psychological tests.  Mr. Lopez did not provide this information to Gamache nor did he attempt to establish any statutory mental mitigation through the testimony of Dr. Gamache or any lay witness.

(PCR Vol. XVII p. 187).  As in <u>Torres-Arboleda</u>, collateral counsel presented substantial mitigation evidence that trial counsel could have discovered if he had conducted a reasonable investigation. Dr. Dee addressed the mental health examination that Gamache did as opposed to Dr. Dee's in the following manner:

> BY MR. KILEY:
> Q.  Let me show you what already is in evidence as Number One. You flip it to the other side, sir, and see – let me get my copy and read along with you.
>         The data Dr. Gamache had available; do you remember it?
> A.  Yes, sir.
> Q.  Now, this services rendered, does it indicate that Dr. Gamache read any of the trial transcripts?
> A.  No.
> Q.  Does it indicate anywhere that Dr. Gamache interviewed that penalty phase witnesses like Francis Valentine, the sister?
> A.  No.
> Q.  Does it indicate that Dr. Gamache had an extensive clinical interview with Mr. Valentine?
> A.  I don't think so.
> Q.  Does it indicate to you that Dr. Gamache knew about the intricate facets about the case?
> A.  Well, given the amount of time he spent reviewing the records I would not think so.
> Q.  Does it indicate to you that Dr. Gamache even read a police report concerning this?
> A.  You can't tell.
> Q.  All right, Doctor, let me show you something else here.  This is Defense Exhibit Two what does that indicate that Dr. Gamache reviewed?
> A.  Prison records.
> Q.  Thank you.
> A.  That's it.
> Q.  Nothing else?
> A.  No.
> Q.  Now it is possible, sir, that had Dr. Gamache reviewed the same material that you reviewed and did the same tests that you took he could have a different opinion, correct, sir?
> A.  Yes.
> Q.  However, sir, would you agree or disagree that would have been

45

up for a jury or a judge to decide which opinion was more credible?

A. Yes.

Q.  And again, sir, in order for you to evaluate what Dr. Gamache tests were, first of all you need to know what they were, right?

A.  Right.

Q.  You don't know if he was measuring this particular difference in intelligence or brain lesion stuff that you have testified at length and to the other confusion of defense counsel previously.

A.  I have no idea.

Q.  You don't know if he gave him the Wechsler, the Denman, the card sorting, the line drawing, whatever you gave him, right?

A.  Well, first of all he couldn't have given him the neurological battery and interview him because there wasn't enough time billed for doing all that.  Three hours is what he billed for and mine took at least 16 hours.

Q.  Really?

A.  Yes. (PCR Vol. XVII p. 258-260).

The testimony of Dr. Michael Gamache which detailed the extent of his evaluation of Mr.

Valentine was addressed in this manner:

Q. Okay. Do you have an independent recollection of meeting with Mr. Valentine and William Fuente and Walter Lopez?

A. No, I don't.

Q.  Okay.  Do the files that you have give you an indication of the sorts of things that you would have done when you met with Mr. Fuente, Mr. Lopez and Mr. Valentine?

A. They do give me some indication, yes.

Q.  And would you please describe what that indication is?

A.  Well, from the – from the invoice, I can determine that that – as well as from the notes, I can determine that I met with Mr. Valentine face to face and conducted an examination on March 15 of 1994. From the invoice, I would conclude that – Bill Fuente was there and present for the examination.  That on a date subsequent to that, April of – 14 of 1994, that I reviewed a volume of records that were provided.  On July 15 of 1994, I had a telephone consultation with attorney Walter Lopez.  On August 16, 1994, I had another telephone consultation with attorney Walter Lopez.  On that same date, I had a conference – I guess a face-to-face conference with him.  I don't know whether that was in my office or his office or elsewhere.  That was also on 8-16-1994.  On the same date, my records reflect that there was a telephone consultation at the request of attorney Lopez

46

with assistant state attorney – looks like the name is Chris Wilkes.

Q.  Actually I think the – one of the prosecutors on the case was a Chris Watson –

A. Okay.

 Q.  – rather than Chris Wilkes.

A. Chris Watson then.  The invoice says Wilkes, but that could be an error.  The following day, August 17, 1994, there was a telephone consultation again with attorney Walter Lopez.  August 17, 1994, I reviewed an additional volume of records that were provided.  And then it looks – I don't –I don't have documentation of any other activity until March 27 of 1995 when I sent a letter to Mr. Lopez about the status of the case.

Q.  And did you record what your opinion about Mr. Valentine was with regard to the second phase and mitigation?

A.  I did not.

Q. Did you record in your letter to Mr. Lopez the substance of your testimony that you and he had discussed?

A.  I believe that is reflected in there. And, again, just to be clear about your previous question, I don't have a record of recording my opinion in this case. That doesn't mean that I didn't, but there  is no longer a record of it in this file.  But in the letter that I referred to, in the first paragraph of that letter, I make reference to one of the telephone consultations that I had with Mr. Lopez where he indicated that the only mitigation that he had to present at sentencing would be my testimony regarding Mr. Valentine's ability to adapt to incarceration.  And while I don't independently recall that, I would presume that we had some discussions about that, and that I thought that – that that was something that could be presented in mitigation in Mr. Valentine's case.   That is I didn't find anything in the examination that would suggest that he was necessarily a threat or danger in an incarcerative setting, and that he could probably adapt adequately to such a setting. (PCR Vol. XIX p. 419-422).

It is clear that penalty phase counsel's representation, investigation and preparation of the penalty phase case fell far below prevailing professional standards pursuant to Wiggins. Penalty phase counsel testified that Gamache did not talk to mitigation witnesses.  (PCR Vol.XVI I p. 184-185). Mr.Lopez did not provide Dr. Gamache with trial transcripts or depositions or police reports. (PCR Vol. XIX p. 381-382).  The mania which Dr. Dee discovered was easily discoverable by Dr.

47

Gamache had he listened to the taped conversations between Mr. Valentine and the surviving victim. The frontal lobe damage discovered by Dr. Dee was also easily discoverable by Dr. Gamache had he given Valentine the 16 hour battery of neuro-psychological tests.  Instead, Mr. Lopez relied only upon a clinical interview conducted by Dr. Gamache and Mr. Valentine's previous lawyer, William Fuente.

In Pearce v. State, 994 So.2d 1094 (Fla. 2008), the Florida Supreme Court reversed the post-conviction court's order granting Pearce a new guilt phase, but affirmed the post-conviction court's order granting Pearce a new penalty phase based on the ineffectiveness of penalty phase counsel. The Florida Supreme Court held:

> Defense counsel indicated that Pearce did not want any form of mitigation presented during the penalty phase.  However, an attorney's obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated because this is an integral part of a capital case.  *See State v. Lewis*, 838 So.2d 1102, 1113 (Fla. 2002) (citing *Rose*, 675 So.2d 567 (holding that an attorney's failure to conduct a reasonable investigation for possible mitigation evidence may render counsel's assistance ineffective)).  Although a defendant may waive mitigation, he should not do so blindly.  Counsel must first investigate and advise the defendant so that the defendant reasonably understands what is being waived and reasonably understands the ramifications of a waiver.  The defendant must be able to make an informed, intelligent decision.
> *See, e.g., Lewis,* 838 So.2d at 1113 (citing *Koon v Dugger,* 619 So.2d 246, 249 (Fla. 1993)0; *Deaton v. Dugger,* 635 So.2d 4, 8 (Fla. 1993).
> We find there is competent, substantial evidence to support the trial court's finding that counsel did not spend sufficient time to prepare for mitigation prior to Pearce's waiver.  In preparing for the penalty phase, counsel never investigated Pearce's background, never interviewed members of Pearce's family, and never investigated mental health issues.  Therefore, counsel was unable to advise Pearce as to potential mitigation.  Thus, the evidence supports the trial court's finding that Pearce's waiver of the presentation of mitigation

48

evidence was not knowingly, voluntarily, and intelligently made. Pearce suffered prejudice based on this lack of a knowing waiver because there was substantial mitigating evidence which was available but undiscovered We affirm the trial court's conclusion that Pearce established a claim for ineffective assistance of counsel in the penalty phase of the trial. Id. At 1102-1103.

In Mr. Valentine's case, Dr. Gamache could not testify as to what if any neuro-psychological tests as part of the clinical examination:

> Q. No, okay. Now, Doctor, so, if you had administered any neruopsychological tests to Mr. Valentine, would you have billed the State of Florida for that?
> A. Yes, I would have. But that would not necessarily – I could have administered psychological or neuropsychological tests as part of the psych examination. We don't necessarily itemize that out timewise, but if I spent time doing it, it would be part of the bill. (PCR Vol. XIX p. 425).

One thing is certain, however, Gamache did not do a complete battery of neuro-psychological tests as did Dr. Dee otherwise there would be a 16 hour billing entry.

A recent case which supports the granting of a new penalty phase is Hurst v. State, 18 So.2d 975 (Fla. 2009).

As in Mr. Valentine's case, Defense counsel Raymond Glenn Arnold testified that he "didn't think that a shrink would find a mental problem," and that he believed he was going to win the guilt phase. Id. At 1009. As in Pearce and Lewis, Mr. Valentine's waiver of presentation of mitigation to the penalty phase jury was not freely, voluntarily, knowingly and intelligently made. As far as Mr. Valentine was concerned, the only mitigation available to him was a paltry stipulation that he would do well in prison. Had he been aware that an important statutory mitigator could have been established had penalty phase counsel bothered to do his job, whether such statutory mitigation could have been presented to a jury or a sentencing Court, the outcome would have been different. But for

49

counsel's unprofessional errors in investigation and preparation, Mr. Valentine was deprived of a reliable adversarial testing of the evidence.   The Hurst Court held that "The evidence presented at the evidentiary hearing established that significant mental mitigation was available and could have been presented in the penalty phase of trial if Hurst had been examined by a mental health expert." Id. At 1010. At Mr. Valentine's evidentiary hearing Dr. Dee testified that a complete neuro-psychological battery of tests was performed on Mr. Valentine.   Trial transcripts, police reports, taped telephone conversations and depositions were reviewed by Dr. Dee to avoid the danger of self-reporting and the mania (an extreme emotional disturbance) as well as the frontal lobe damage (an extreme mental disturbance) was established.  All of the evidence of mental or emotional disturbance at the time of the offense could have and should have been discovered and presented at penalty phase by penalty phase counsel. This was not done to the detriment of Mr. Valentine. Regarding the propriety of having the client thoroughly examined by a mental health professional, the Hurst Court cited Jones v. State, 998 So.2d 573 (Fla. 2008) in this manner in reaching its decision to award Hurst a new penalty phase:

> Where available information indicates that the defendant could have mental health problems, "such an evaluation is 'fundamental in defending against the death penalty.'" Arbelaez, 898 So.2d at 34 (quoting Bruno v. State, 807 So.2d 55, 74 (Fla. 2001) (Anstead, J., concurring in part and dissenting in part)). Id. at 583.

In Mr. Valentine's case, the pre-trial depositions and taped phone conversations which Dr. Dee reviewed and which were certainly available to trial counsel clearly indicated that the magical thinking and mania was information that the defendant could have mental health problems.  Effective counsel would not have abandoned these leads and would have further investigated.  Had he done so a statutory mitigator would have been established.

50

The <u>Hurst</u> Court further held:

> Although trial counsel testified that he personally saw nothing that would have required a psychiatric or psychological examination, in assessing the reasonableness of counsel's investigation and decision not to obtain a mental health evaluation in this case, the Court " must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." <u>Wiggins v. Smith</u>, 539 U.S. 510, 523 (2003).We conclude that the evidence and information available to Hurst's counsel was sufficient to place him on notice that further investigation of mental mitigation was necessary; consequently, his decision not to pursue it was not reasonable under the circumstances of this case. <u>Id</u>. At 1010.

The <u>Hurst</u> Court further held:

> Recently, in <u>Parker v. State</u>, 3 So.3d 974 (Fla. 2009), we reversed for a new penalty phase where counsel presented only "bare bones" mitigation at trial and where substantial mental mitigation and mitigation concerning Parker's childhood were discovered and presented at the postconviction evidentiary hearing. <u>Id</u>. At 984. The Court stated, "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" <u>Id</u>. At 984-85 (quoting the American Bar Association, <u>Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases</u> guideline 11.4.1 ( C ), at 93 (1989)). "Among the topics that counsel should consider presenting in mitigation are the defendant's medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experience, and religious and cultural influences." <u>Parker</u>, 3 So.3d 985 (citing ABA guideline 11.8.6, at 133). In this case, counsel not only failed to investigate mental mitigation reasonably suggested by available evidence, he also failed to present the relevant features of Hurst's educational background and school records, which showed Hurst was a special education student with borderline intelligence who dropped out of school after repeating the tenth grade. <u>Id</u>. at 1011.

Postconviction counsel respectfully contends that the testimony of Iris Sterling cited above stating

that this recently convicted murderer was really very respectful in school, the testimony of Frances

51

Valentine Pineda which provided leads that were ignored by defense counsel, the testimony of

Emigrey Zuniga Rios (FSC ROA Vol XVI p. 1842-1844) that Mr. Valentine was good with children

and the paltry stipulation that was read to the trial court was indeed "bare bones mitigation."  There

was nothing to prevent penalty phase counsel from taking the leads supplied by Frances Valentine

Pineda and doing a complete mental health investigation and presenting it at the <u>Spencer</u> hearing.

The <u>Hurst</u> Court further held:

> In <u>Hildwin v. Dugger</u>, 654 So.2d 107 (Fla. 1995), we reversed for a new penalty phase because trial counsel's investigation was "woefully inadequate" and failed to discover "an abundance of mitigating evidence which his trial counsel could have presented at sentencing," in addition to the lay witnesses who testified and which would have established statutory mental mitigation.  <u>Id</u>. At 109-10.
>
> Thus, mental mitigation that establishes statutory and nonstatutory mitigation can be considered to be a weighty mitigator, and failure to discover and present it, especially where the only other mitigation is insubstantial, can therefore be prejudicial.  We do not overlook the fact that this murder was especially heinous, atrocious or cruel or that the robbery aggravator clearly exists. <u>Id</u>. at 1014.

Ultimately, the <u>Hurst</u> Court held:

> Because this mitigation was not made available for the jury or the trial judge to consider before the death sentence was imposed, our confidence in the imposition of the death penalty in this case is undermined.  Accordingly, we must vacate the death sentence in this case and remand for a new penalty phase proceeding.  <u>Id</u>. At 1015.

The United States Supreme Court also addressed lack of investigation in <u>Williams v. Taylor</u>,

529 U.S. 362 (U.S. Va., 2000) stating that "the graphic description of Williams' childhood, filled

with abuse and privation, or the realty that he was "borderline mentally retarded," might well have

influenced the jury's appraisal of his moral culpability."  In <u>Williams</u>, the Court recognized the

influence that mitigation evidence could have on a jury.  In Mr. Valentine's case, the establishment

of a statutory mitigator might well have influenced the jury's appraisal of his moral culpability or assuming his waiver of the penalty phase jury hearing this important mitigation was knowingly, voluntarily and intelligently made (this assumption is purely speculative as Mr. Valentine had no knowledge that a statutory mitigator would be established due to penalty phase counsel's ineffectiveness) to the trial court. In Porter v. McCollum,558 U.S. 30, 130 S.Ct. 447, 449 (2009) 175 L.Ed.2d 398 (2009), the facts and legal reasoning of the United States Supreme Court fall squarely on point with the facts of Mr. Valentine's case. Regarding the post-conviction aspect of Porter's case; the United States Supreme Court contrasted what was presented in penalty phase and what was presented at the post-conviction evidentiary hearing thusly:

> In 1995, Porter filed a petition for postconviction relief I state court, claiming his penalty-phase counsel failed to investigate and present mitigating evidence.  The court conducted a 2-day evidentiary hearing, during which Porter presented extensive mitigating evidence, all of which was apparently unknown to his penalty-phase counsel. Unlike the evidence presented during Porter's penalty hearing, which left the jury knowing hardly anything about him other than the facts of his crimes, the new evidence described his abusive childhood, his heroic military service and the trauma he suffered because of it, his long-term substance abuse, and his impaired mental health and mental capacity.  Id. at 449.

In Mr. Valentine's case, the trial Court knew nothing about Mr. Valentine other than the facts of the crime itself.  Mitigation was minimal vague testimony by lay witnesses and a stipulation that Mr. Valentine would adapt to prison life was read into the record.

Regarding the psychological evaluation and its application to Mr. Valentine's case; the Porter Court held thusly:

> In addition to this testimony regarding his life history, Porter presented an expert in neuropsychology, Dr. Dee, who has examined porter and administered a number of psychological assessments.  Dr.

53

Dee concluded that Porter suffered from brain damage that could manifest in impulsive, violent behavior. At the time of the crime, Dr. Dee testified, Porter was substantially impaired in his ability to conform his conduct to the law and suffered from an extreme mental or emotional disturbance, two statutory mitigating circumstances, Fla. Stat.§ 921.141 (6). Dr. Dee also testified that Porter had substantial difficulties with reading, writing, and memory. And that these cognitive defects were present when he was evaluated for competency to stand trial. 2/Tr. 227-228 (Jan. 5, 1996); see also Record 904-906. Although the State's experts reached different conclusions regarding the statutory mitigators, each expert testified that he could not diagnose Porter or rule out a brain abnormality. Id. at 451.

At Mr. Valentine's evidentiary hearing, the State called no experts to test and subsequently render a diagnosis. Therefore, Dr. Dee's diagnosis of hypo-mania and brain damage which established an important statutory mental mitigator was unrebutted.

Regarding the investigation of mitigation; the Porter Court held further:

Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim *de novo. Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005). It is unquestioned that under the prevailing professional norms at the time of Porter's trial, counsel had an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 392, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The investigation conducted by Porter's counsel clearly did not satisfy those norms. Id. at 452-453.

In Mr. Valentine's case, the investigation at trial as opposed to the investigation and evaluation of Mr. Valentine in post-conviction clearly fell under the prevailing professional norms. The sentencing court heard nothing that would humanize Mr. Valentine. Regarding this aspect of the case, the Porter Court further held:

The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability. They learned about Porter's turbulent

54

relationship with Williams, his crimes, and almost nothing else.  Had Porter's counsel been effective, the judge and jury would have of the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability."  *Wiggins, supra,*at 535, 123 S.Ct. 2527.  Id. at 454.

In Mr. Valentine's case, the facts of the crime and the paltry stipulation that Mr. Valentine would adapt to prison life did nothing to enable the sentencing court to assess Mr. Valentine's moral culpability.  The evidence of brain injury, hypo-mania, magical thinking and extreme mental or emotional disturbance adduced at the evidentiary hearing would have changed the outcome of the case.  Relief is proper.

Regarding the issue of prejudice; the Porter Court held:

> The Florida Supreme Court's decision that Porter was not prejudiced by his counsel's failure to conduct a thorough-or even cursory-investigation is unreasonable.  The Florida Supreme Court either did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing.  Under Florida law, mental health evidence that does not rise to the level of establishing a statutory mitigating circumstance may nonetheless be considered by the sentencing judge and jury as mitigating.  See, *e.g. Hoskins v. State,* 965 So.2d 1, 17-18 (Fla. 2007) (*per curiam).*  Indeed, the Constitution requires that "the sentencer in capital cases must be permitted to consider any relevant mitigating factor."  *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).  Yet neither the postconviction trial court nor the Florida Supreme Court gave any consideration for the purpose of nonstatutory mitigation to Dr. Dee's testimony regarding the existence of a brain abnormality and cognitive defects.   While the State's experts identified perceived problems with the tests that Dr. Dee used and the conclusions that he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the jury or the sentencing judge.  Id. at 454-455.

Because trial counsel "didn't think the case would go to penalty phase"; he completely neglected to prepare any meaningful mitigation at all.  At the evidentiary hearing, it was clear that

significant leads were ignored. Had Valentine's childhood history and behavior been explored, significant non statutory mitigation would have been established. For example, Valentine's interaction with family members and other children (story telling and magical thinking) would be found. That Valentine was really a wronged husband rather than a jealous ex-husband would have highlighted the cultural differences regarding marriage in Central America versus the United States. Valentine's devotion to his daughter along with th e established stipulated adaptability to prison and the established mental mitigation would have swayed the sentencer to recommend life over death.

### GROUND XIII

**Appellate counsel was ineffective on direct appeal for not raising the claim that Petitioner was denied a fundamentally fair trial guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United states Constitution and the corresponding provisions of the Florida constitution due to the State's improper comments during closing argument.**

The Florida Supreme Court denied this claim stating:

> Valentine first argues that he was denied the effective assistance of appellate counsel because appellate counsel failed to argue on direct appeal that Valentine was denied a fair trial as a result of prosecutorial misconduct. We disagree; Valentine's claim is both procedurally barred and without merit.
> ...
> Valentine's habeas petition attempts to reargue substantive claims of prosecutorial misconduct that were already raised in his postconviction motion and addressed above. *See Spencer v. State*, 842 So.2d 52, 60 (Fla. 2003)
> ....
> Moreover, Valentine is not entitled to relief because he has not demonstrated deficiency. Only one of the prosecutor's comments that Valentine argues was improper was objected to at trial and preserved for review on direct appeal, and Valentine has not identified any additional rulings from his trial that amount to fundamental error. *See Patton v. State*, 878 So.2d 368, 379 (Fla. 2004) ("In the absence of

fundamental error, appellate counsel cannot be deemed ineffective for failing to raise [an] unpreserved issue."). The lone comment to which Valentine objected at trial was the prosecution's statement that Valentine's sister had been called the day after the crime but did not give information as to Valentine's location. Valentine's objection was properly overruled as being a fair comment based on evidence that had been adduced at trial, specifically the testimony of a police officer who had called Valentine's sister the day after the crime in an effort to find Valentine and who did not hear back from her until after Valentine had been apprehended. *See Griffin*, 866 So.2d at 16 (:Merely arguing a prosecutorial misconduct were addressed above in Section II-A and are meritless. Because the record clearly demonstrates tha the challenged comments were not improper, appelata counsel cannot be ineffective for failing to raise a meritless argument *See Wyatt*, 71 So.3d at 114-15.

Accordingly, we deny relief on Valentine's claim of ineffective assistance of appellate counsel. <u>Valentine v. State</u>, 98 So.3d 44(2012).

During closing argument, the assistant state attorney, Karen Cox, told the jury:

"She [Livia] had seen *her husband* rendered helpless and bound. (Emphasis added)(FSC ROA Vol. XV p. 1660 "...and it has always been about *Livia Porche* and Terance Valentine." (Emphasis added)( FSC ROA Vol. XV p. 1663).

"...*Livia and her husband, Ferdinand,* were the victims of violence and bloodshed in that house." (Emphasis added)(FSC ROA Vol. XV p. 1664).

"Now, did this man consciously decide to kill *Livia Porche?"* (Emphasis added) (FSC ROA Vol. XV p. 1664).

"Terance Valentine was a wanted man in the United States in connection with the homicide of Ferdinand Porche and the shooting

of *Livia Porche."* (Emphasis added)(FSC ROA Vol. XV p. 1707).

"... bring it to Giovana's room where *Livia Porche* is laying..." (Emphasis added)( FSC ROA Vol. XV p. 1717).

" What motive does anybody in the world have to do this to *Livia Porche...?"* (Emphasis added)(FSC ROA Vol. XV p. 1723).

"...photos of her [Livia] *husband* and children..." (Emphasis added)( FSC ROA Vol. XV p. 1724).

"...he's the man who shattered the live of *Livia Porche..."* (Emphasis added)(FSC ROA Vol. XV p. 1727).

During closing argument, the assistant state attorney, Karen Cox, told the jury as follows:

"The day after this happened, Elizabeth Valentine, his sister, was called and asked, 'where is he?  We are looking for him.'  She provided no information.  They would have you believe that there was this party on Children's Day, and Children's Day, this party on this particular Children's Day, was the most memorable social event the history of mankind, right up there with the wedding of Charles and Diana; and yet these people, they don't storm the United states Embassy an say, 'Wait a minute Wait a minute, What is going on here?  This is my brother you are talking about, and he was right here in San Jose with us." (FSC ROA Vol. XV p. 1708).

Defense counsel objected to the prosecution's improper comments stating that:

"I am going to object.  There is no evidence as to when these people

58

– that these people knew the date on which the offense occurred. There is just simply no evidence as to when these people  - that these people knew the date on which the offense occurred.  There is just simply no evidence of it, and that is unfair commentary.  They didn't find out in certain cases until lawyers came there and later on were they first advised of the date and then. (FSC ROA Vol. XV p. 1709) The trial court overruled the objection stating that "The lawyers are allowed to argue the evidence and reasonable inferences."  (FSC ROA Vol. XV p. 1709).

During closing argument, the assistant state attorney, Karen Cox, told the jury:

"...he calls us [Defendant's family] from prison to Costa Rica.  What is going on here.  Why did every single family member and in-law deny any kind of contact?" (FSC ROA Vol. XV p. 1713).  There was no evidence or testimony of any calls made from Florida state Prison.

During closing argument, the assistant state attorney, Karen Cox, told the jury:

"Mr. Unterberger says that the shooting didn't happen in the back seat of the Blazer, but he ignores the testimony of Dr. Miller that said that there is blood spatter on this Blazer..." (FSC ROA Vol. XV p. 1727).  There is no evidence or testimony that Dr. Miller examined the Blazer.

During closing argument, the assistant state attorney, Karen Cox told the jury:

"Now, Mr. Unterberger wants you to believe that she [Livia] is lying

and to have you believe that she is lying, he has to provide you with

a motivation for why she was lying and so her motivation is this

Costa Rican divorce.  He somehow wants you to believe and wants

to suggest to you that it is this woman, she was laying there, bound,

bloodied, naked, wondering if she was going to live or die, not

knowing if she would ever see her children again, she thought 'Hey,

if I say Terance did it, maybe he has got some property in Costa Rica

and I will get an attorney, and we will do a property search, and

maybe I will get half...'  (FSC ROA Vol. XV p. 1724).

During closing argument, prosecutor Cox sought to bolster the credibility of the State's case

with the following statements:

[MS. COX]: what motive does anybody in the world have to do this

to Livia Porche except the man who so hated her and who thought

that she was keeping him from his child and who thought that she had

his belongings and that they were rightfully his?  What other person

in the world would do this to Livia Porche and Ferdinand Porche and,

before taking them out of the scene, would take the time and the

trouble to subject her to the degradation having photos of her mother

and photos of her husband children shredded and dropped over her

body?  Who else would do this type of commando raid into that house

and really not take anything except the life of her husband?  Who else

was calling her and telling her to disappear?  No one.  No one in the

60

world.  (FSC ROA Vol. XV p. 1723).

Ms. Cox  made improper comments expressing her personal beliefs concerning defense counsel's presentation of his case and improperly attacked opposing counsel's theory of defense. See United States v. Young, 105 S. Ct. 1038 (1985).  It is impermissible for a prosecutor to criticize defense counsel's closing argument or ridicule a defendant or his theory of defense.  See Riley v. State, 560 So.2d 279, 280 (Fla. 3d DCA 1990); Rosso v. State, 505 So.2d 611, 612 (Fla. 3d DCA 1987).

In this case, the prosecutor continued beyond the limits of proper and ethical prosecutorial conduct.  In closing, the prosecutor commented on facts not in evidence and interjected improper personal comments.  This case is yet another example where the prosecutor's over zealousness in prosecuting the State's cause worked against justice rather than for it. Gore v. State, 719 So.2d 1197, 1203 (Fla.1998) (quoting Ryan v. State, 457 So.2d 1084, 1091 (Fla. 4th DCA 1984)). See  Ruiz v. State, 743 So.2d 1 (Fla. 1999); Kellogg v. State, 761 So.2d 409 (Fla. 2d DCA 2000).

In Ruiz, the Defendant was convicted in the Circuit Court, Hillsborough County, of first-degree murder and sentenced to death.  Mr. Ruiz appealed. The Florida Supreme Court held that the prosecutor, the same Karen Cox, engaged in misconduct in closing arguments. The court reversed the conviction and vacated the sentence because of prosecutorial misconduct.

In Ruiz, as here, the defendant presented an alibi defense, claiming that he was in Orlando on the day of the murder.  Several witnesses attested to this.  At the conclusion of the evidence, Ruiz was convicted and charged. On appeal, Ruiz argued, inter alia, prosecutorial misconduct on the part of Karen Cox during closing argument.  The Florida Supreme Court agreed.

"A criminal trial provides a neutral arena for the presentation of evidence upon which alone

61

the jury must base its determination of a defendant's innocence or guilt.  Attorneys for both sides,

following rules of evidence and procedure designed to protect the neutrality and fairness of the trial,

must stage their versions of the truth within that arena.  That which has gone before cannot be

considered by the jury except to the extent it can be properly presented at the trial and those things

that cannot properly be presented must not be considered at all." Ruiz, 743 So.2d at 4.

The role of the attorney in closing argument is "to assist jury in analyzing, evaluating and

applying the evidence.  It is not for the purpose of permitting counsel to "testify" as an expert

witnesses .' The assistance  permitted includes counsel's right to state his contention as to the

conclusions that the jury should draw from the evidence."  United States v. Morris, 568 F.2d 396,

401 (5th Cir. 1978). "To the extent an attorney's closing argument ranges beyond these boundaries

it is improper.  Except to the extent he bases any opinion on the evidence in the case, he may not

express his personal opinion on the merits of the case or the credibility of witnesses.  Furthermore,

he may not suggest that evidence which was not presented at trial provides additional grounds for

finding defendant guilty." Ruiz, 743 So.2d at 4.

The witnesses for both the State and the defense were subjected to extensive cross-

examination and impeachment, and the credibility of each was called into question.  During closing

argument, prosecutor Cox sought to bolster the credibility of the State's case with the following

improper statements:

> [MS. COX:] What motive does anybody in the world have to do this
> to Livia Proche except the man who so hated her and who thought
> that she was keeping him from his child and who thought that she had
> his belongings and that they were rightfully his?
> What other person in the world would do this to Livia Porche and
> Ferdinand Porche and, before taking them out of the scene, would
> take the time and the trouble to subject her to the degradation having

> photos of her mother and photos of her husband children shredded
> and dropped over her body?
> Who else would do this type of commando raid into that house and
> really not take anything except the life of her husband?  Who else was
> calling her and telling her to disappear? No one. No one in the world.
> (FSC ROA Vol. XV p. 1723).

Mr. Valentine's convictions are irreparably tainted.  The record shows that this trial was permeated by egregious and inexcusable prosecutorial misconduct.  Ms. Cox attempted to tilt the playing field and obtain a conviction and death sentence in a number of improper ways: by demeaning and ridiculing the defendant and his counsel; by appealing to the jurors' raw emotions; and by introducing improper evidence.

The prosecutor crossed the lien of zealous advocacy by a wide margin and compromised the integrity of the proceeding.  See Garcia v. State, 622 So.2d 1325, 1332 (Fla. 1993) ("Once again, we are compelled to reiterate the need for propriety, particularly where the death penalty is involved....") Nowitzke v. State, 572 So.2d 1346, 1356 (Fla. 1990) ("[W]e are distressed over the lack of propriety and restraint exhibited in the overzealous prosecution of capital cases, and we feel compelled to reiterate [the warning expressed in Bertolotti].");  Garron v. State, 528 So.2d 353, 359 (Fla. 1988) ("Such violations of the prosecutor's misconduct in several death penalty cases...This Court considers this sort of prosecutorial misconduct, In the face of repeated admonitions against such overreaching, to be grounds for appropriate disciplinary proceedings."); Urbin V. State, 714 So.2d 411 (Fla. 1998) (reversing death sentence and condemning extensive prosecutorial misconduct).

The cumulative effect of the prosecutor's improper conduct constitute fundamental error. Here, the prosecutor made an attack on defense counsel, commented on a matters not in evidence, invaded the jury's providence , bolstered the officers, bolstered the state witness, and shifted the

burden of proof.  This is the type of error which reaches down into the validity of the trial itself, to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.  See McDonald v. State, 743 So.2d 501 (Fla. 1999).

Here, the prosecutor's comments were so prejudicial as to vitiate the entire trial. McDonald at 505. Fundamental error in closing occurs when the "prejudicial conduct in its collective import is so extensive that its influence pervades the trial, gravely impairing a calm and dispassionate consideration of the evidence and the merits by the jury." Silva v. Nightingale, 619 So.2d 4, 5 (Fla. 5th DCA 1993). The cumulative effect of the prosecutor's improper comments vitiated the fairness of the appellant's trial.  See Caraballo v. State, 762 So.2d 542 (Fla. 5th DCA 2000).

Here, the cumulative effect of the prosecutor's improper comments deprived Mr. Valentine of a fair trial.  See Brown v. State, 593 So.2d 1210 (Fla.2d DCA 1992) (holding that a combination of improper comments made by the prosecutor during closing argument required reversal and remand for a new trial). Accordingly, Mr. Valentine's judgment of conviction and sentence must be vacated and set aside. See Ruiz.  To the extent that appellate counsel failed to raise this issue on direct appeal, counsel was ineffective.

## GROUND XIV

**Cumulatively, the combination of procedural and substantive errors deprived Petitioner of a fundamentally fair trial guaranteed under the Fourth, Fifth, Sixth, Eighth, and fourteenth amendments to the United States Constitution and the corresponding provisions of the Florida Constitution.**

Petitioner did not receive the fundamentally fair trial to which he was entitled.  The sheer number and types of errors in Petitioner's guilt and penalty phases, when considered as a whole, virtually dictated the sentence of death.  While there are means for addressing each individual error,

addressing these errors on an individual basis will not afford adequate safeguards required by the Constitution against an improperly imposed death sentence.  The improper prosecutorial misconduct perpetrated by Karen Cox, the failure to conduct a proper investigation into Petitioner's mental health problems, in addition to the errors on direct appeal; all of these errors deprived Petitioner of a fair adversarial testing of the evidence in both guilt and penalty phase.  When considered in the aggregate, these errors cannot be harmless.

Mr. Valentine did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth Amendments.  See Heath v. Jones, 941 F.2d 1126 (11th Cir. 1991); Derden v. McNeel, 938 F.2d 605 (5th Cir. 1991). The sheer number and types of errors in Mr. Valentine's guilt and penalty phases, when considered as a whole, virtually dictated the sentence of death. While there are means for addressing each individual error, addressing these errors on an individual basis will not afford adequate safeguards required by the Constitution against an improperly imposed death sentence.  Repeated instances of ineffective assistance of counsel, prosecutorial misconduct, and an unconstitutional process significantly tainted Mr. Valentine's capital proceedings.

The improper prosecutorial misconduct perpetrated by Karen Cox, the failure to conduct a proper investigation into Mr. Valentine's mental health problems, in addition to the errors on direct appeal; all of these errors deprived Mr. Valentine of a fair adversarial testing of the evidence in both guilt and penalty phase.  When considered in the aggregate, these errors cannot be harmless.

Under Florida case law, the cumulative effect of these errors denied Mr. Valentine his fundamental rights under the Constitution of the United States and the Florida Constitution.  State v. DiGuilio, 491 So. 2d 1129 (Fla. 1986); Ray v. State, 403 So. 2d 956 (Fla. 1981); Taylor v. State, 640 So. 2d 1127 (Fla. 1st DCA 1994); Stewart v. State, 622 So. 2d 51 (Fla. 5th DCA 1993); Landry

v. State, 620 So. 2d 1099 (Fla. 4th DCA 1993), Penalver v. State, 926 So.2d 1118 (Fla. 2006).

## GROUND XV

**Petitioner" Eighth Amendment right against cruel and unusual punishment will be violated as Petitioner may be incompetent at time of execution.**

The Florida Supreme Court denied this claim stating that Valentine is not entitled to relief

on this claim stating:

> Valentine contends that his Eighth Amendment right against cruel and unusual punishment will be violated because he may be incompetent at the time of his eventual execution. Valentine acknowledges that his claim is not ripe fpr review since a death warrant has not been issued and asserts that he raises this issue for preservation purposes only. We have repeatedly held that no relief is warranted under similar circumstances.

 Valentine v. State, 98So.3d 44(2012)

In accordance with Florida Rules of Criminal Procedure 3.811 and 3.812, a prisoner cannot

be executed if "the person lacks the mental capacity to understand the fact of the impending death

and the reason for it."  This rule was enacted in response to Ford v. Wainwright, 477 U.S. 399, 106

S.Ct. 2595 (1986).

The undersigned acknowledges that under Florida law, a claim of incompetency to be

executed cannot be asserted until a death warrant has been issued.  Further, the undersigned

acknowledges that before a judicial review  may be held in Florida, the defendant must first submit

his claim in accordance with Florida Statutes.  The only time a prisoner can legally raise the issue

of his sanity to be executed is after the Governor issues a death warrant.  Until the death warrant is

signed the issue is not ripe.  This is established under Florida law pursuant to Section 922.07, Florida

66

Statutes (1985) and <u>Martin v. Wainwright</u>, 497 So.2d 872 (1986)(If Martin's counsel wish to pursue

this claim, we direct them to initiate the sanity proceedings set out in <u>section 922.07, Florida Statutes</u>

<u>(1985)</u>.

    The same holding exists under federal law.  <u>Poland v. Stewart</u>, 41 F. Supp. 2d 1037 (D. Ariz

1999) (such claims truly are not ripe unless a death warrant has been issued and an execution date

is pending); <u>Martinez-Villareal v. Stewart</u>, 118 S. Ct. 1618, 523 U.S. 637, 140 L.Ed.2d 849

(1998)(respondent's Ford claim was dismissed as premature, not because he had not exhausted state

remedies, but because his execution was not imminent and therefore his competency to be executed

could not be determined at that time); <u>Herrera v. Collins</u>, 506 U.S. 390, 113 S. Ct. 853, 122 L.Ed.2d

203 (1993)(the issue of sanity [for <u>Ford</u> claim] is properly considered in proximity to the execution).

    However, most recently, in <u>In RE:Provenzano</u>, No. 00-13193 (11th Cir.

June 21, 2000), the 11th Circuit Court of Appeals has stated:

> Realizing that our decision in <u>In Re: Medina</u>, 109 F.3d 1556 (11th Cir.
> 1997), forecloses us from granting him authorization to file such a
> claim in a second or successive petition, Provenzano asks us to revisit
> that decision in light of the Supreme Court's subsequent decision in
> <u>Stewart v. Martinez-Villareal</u>, 118 S.Ct. 1618 (1998).   Under our
> prior panel precedent rule, <u>See</u> <u>United States v. Steele</u>, 147 F.3d
> 1316, 1317-18 (11th Cir. 1998)(en banc), we are bound to follow the
> <u>Medina</u> decision.  We would, of course, not only be authorized but
> also required to depart from <u>Medina</u> if an intervening Supreme Court
> decision actually overruled or conflicted with it.[citations omitted]

    <u>Stewart v. Martinez-Villareal</u> does not conflict with <u>Medina</u>'s holding that a competency to

be executed claim not raised in the initial habeas petition is subject to the strictures of 28 U.S.C. Sec

2244(b)(2), and that such a claim cannot meet either of the exceptions set out in that provision. <u>Id</u>.

at pages 2-3 of opinion.

Federal law requires that in order to preserve a competency to be executed claim, the claim must be raised in the initial petition for habeas corpus, and in order to raise an issue in a federal habeas petition, the issue must be raised and exhausted in state court.  Hence, Mr. Valentine is filing this petition.

The appellant has been incarcerated since [1989].  Statistics have shown that an individual incarcerated over a long period of time will diminish his mental capacity.  Inasmuch as the appellant may well be incompetent at time of execution, his Eighth Amendment right against cruel and unusual punishment will be violated.

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 21st, 2013, I electronically filed the forgoing

**PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF PETITION FOR WRIT OF**

**HABEAS CORPUS** with the Clerk of the Court by using the CM/ECF system which will send

notice of electronic filing to Carol M. Dittmar, Assistant Attorney General, Office of the Attorney

General, Concourse Center 4, 3507 E. Frontage Road., Suite 200, Tampa, FL 33607-7013.  I further

certify that I mailed the forgoing document and the notice of electronic filing by first-class mail to

the following non-CM/ECF participant: Terance Valentine, 119682, Union Correctional Institution,

7819 N.W. 228th Street Tampa, FL 32026.

<div style="margin-left:55%">

s/ Ali A. Shakoor
ALI ANDREW SHAKOOR
Florida Bar No. 0669830
C A P I T A L   C O L L A T E R A L
REGIONAL
COUNSEL-MIDDLE REGION
3801 Corporex Park Drive
Suite 210
Tampa, Florida 33619
813-740-3544
813-740-3554 (Facsimile)

</div>